UNITED STATES of America, Appellee,

v.

Bernard V. NARDI, Jr., Defendant,
Appellant.

No. 79–1450.

United States Court of Appeals,
First Circuit.

Argued Sept. 3, 1980.

Decided Nov. 12, 1980.

David L. Nixon, Manchester, N.H., with whom David W. Hess, Brown & Nixon Professional Association, Manchester, N.H. and Tybursky & Watson, Portsmouth, N.H., were on brief, for defendant, appellant.

Steven M. Gordon, Asst. U. S. Atty., Concord, N.H., with whom William H. Shaheen, U. S. Atty., Concord, N.H., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and KEETON,* District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Appellant Bernard V. Nardi, Jr. was convicted, after a ten–day bench trial, of conspiracy to commit certain bank robberies in violation of 18 U.S.C. § 371, receipt of the proceeds of one bank robbery, in violation of 18 U.S.C. § 2113(a), and being an accessory after the fact by assisting in concealment of the proceeds of another robbery, in violation of 18 U.S.C. § 3. He now challenges the sufficiency of the evidence and certain evidentiary rulings. He also claims to have been denied a fair trial, asserting that he was refused permission to interview a government witness and was denied com-

* Of the District of Massachusetts, sitting by designation.

pulsory process in regard to a potential defense witness.

Nardi's indictment occurred as a result of a series of bank robberies in New Hampshire during the spring and summer of 1977. The individuals who actually committed the robberies were Marc Levesque and Mark Dubois, both of them former inmates of the New Hampshire State Prison. Several other persons participated in the robbery plans, which were masterminded by Daniel MacLeod, who was an inmate at the New Hampshire State Prison during this period.

Nardi is an attorney who served, under a contract with the New Hampshire Bar Association, as the prison attorney for the inmates of the New Hampshire State Prison. He held that position from March of 1976 to June of 1977. In his role as prison attorney, he became acquainted with both MacLeod and Dubois. He also became acquainted with Levesque, who was not an inmate; the circumstances of that relationship are in dispute.

The government contended, and the district court found, that Nardi joined with MacLeod, Dubois and Levesque in a conspiracy to rob banks. Nardi's alleged role was to serve as the "front man," investing the proceeds of the robberies and providing whatever legal services might be needed by the group. The government's version of events was essentially as follows: In May of 1977, Nardi helped to arrange a fake job for Dubois in order to get him parole so that he could participate in the robberies. In April of 1977, Nardi received $1,000 from Levesque's first robbery and deposited the funds in MacLeod's account; also in April, he executed a bank withdrawal slip for Levesque's and Dubois' use in withdrawing those funds for expenditures related to the conspiracy. In June of 1977 Nardi transported Dubois out of the prison to begin his parole and brought him to Levesque. On June 24, 1977, the night of the second bank robbery, Nardi met with Dubois and Levesque and loaned them $75; on July 28, 1977 Nardi received either $1,000 or $1,500

of the proceeds of the fourth bank robbery, and on that date accompanied Levesque to the Nashua police for questioning. He also on that day arranged for his cousin, Stephen Lancellotti, to provide Dubois with a safe deposit box in which to deposit proceeds of the fourth robbery.

## I. Sufficiency of the Evidence

Nardi argues that the evidence was insufficient to establish beyond a reasonable doubt that he knowingly participated in the conspiracy and that he knowingly received and helped to conceal proceeds of the robberies. Nardi would characterize his conduct as simply that of an attorney providing legal services to his clients. He characterizes the money he received on July 28 as a retainer paid for legal representation and returned when he withdrew from representation. Nardi asserts that the only evidence of his knowledge of, and active participation in, the conspiracy, is the testimony of Mark Dubois and Stephen Lancellotti. He challenges the credibility of both these witnesses, arguing that Dubois' testimony was "purchased" by the government's cooperation in the reduction of his sentence, that Lancellotti had demonstrated his lack of credibility through earlier false statements, and that Lancellotti's testimony was influenced by the grant of informal immunity.

In assessing the sufficiency of the evidence, we must view it in the light most favorable to the prosecution and decide whether a rational trier of fact could have found guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Davis*, 623 F.2d, slip op. at 195 (1st Cir. June 12, 1980); *United States v. Indelicato*, 611 F.2d 376, 384 (1st Cir. 1979). Our role is not to assess the credibility of the witnesses; that judgment is for the trier of fact. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 468, 86 L.Ed. 680 (1942).

■ Here, the district court, sitting as the trier of fact, issued a comprehensive opinion, analyzing the evidence and making specific findings. It found the testimony of Dubois and Lancellotti to be credible, despite Nardi's attempts at impeachment. Accepting that finding, as in large measure we must, we believe the evidence of Nardi's knowing participation to be more than adequate to support the court's verdict. Even without those witnesses, the evidence of Nardi's knowing participation was significant. The district court, in fact, indicated that it based its judgment primarily on inferences from Nardi's own conduct and on its disbelief in his explanations for that conduct, using the testimony of Dubois and Lancellotti largely as corroboration.

## II. Hearsay Testimony

Several witnesses testified to statements made by Daniel MacLeod which implicated Nardi in the conspiracy. The district court admitted these statements under the co-conspirator exception to the hearsay rule, Rule 801(d)(2)(E) of the Federal Rules of Evidence. Under that exception, hearsay testimony of statements made by a co-conspirator during and in furtherance of the conspiracy may be received if the court finds that the existence of a conspiracy in which the defendant participated is established by a preponderance of independent, non-hearsay evidence. *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977).

■ The district court explicitly found that "a preponderance of the evidence exists to demonstrate that a conspiracy existed, that Levesque, Dubois, MacLeod and the defendant were members of such conspiracy." Nardi argues, however, that the required independent proof of his membership in the conspiracy was not forthcoming. We do not agree. Both Dubois and Lancellotti testified to conversations and dealings with and by Nardi, forming strong evidence, if believed, of Nardi's complicity. As indicated, however, the lower court appears to have predicated its finding of Nardi's involvement largely on inferences drawn from Nardi's own testimony and other evidence concerning his conduct including its adverse impression of his veracity. As the court correctly observed, "[a] defendant's own conduct, acts, and statements may be

sufficient to provide the independent proof to establish his membership in a criminal conspiracy." The court noted that Nardi's testimony that he first met Levesque on April 5, 1977 was disproved by telephone records showing a call from Nardi's office to Levesque's father's Arco station on March 1, 1977. The court found that Nardi had concealed from prison officials the source of the $1,000 which he received from Levesque and sought to deposit in MacLeod's prison account, and that he delivered Dubois from the prison to Levesque with whom Dubois had been instructed to avoid contact. The court found that Nardi had testified falsely regarding Levesque's involvement in arranging false employment for Dubois, and regarding his own contacts with Levesque during the spring of 1977. The court found Nardi's involvement in arranging employment and transportation for Dubois to be unusual and unprecedented. The court found that Nardi concealed his contacts with Dubois from Dubois' parole officer, and that no legitimate reason for this concealment was offered.

Strong evidence of Nardi's participation in the conspiracy was his receipt of the $1,000 "retainer" on July 28. The court noted that none of this money was credited to Levesque's account with Nardi's law firm, and that Nardi's claimed failure to inquire into the source of the funds was not credible in the light of his recent loan to Levesque and Dubois.

The court registered its disbelief of Nardi's testimony regarding his trip with Levesque to meet with the Nashua police, finding implausible Nardi's assertion that he thought the Nashua police wanted to question Levesque about a federal parole violation, and noting that Nardi made no record of the trip in his lawyer's diary. The court also noted Nardi's admitted advice to Dubois that he travel to Rhode Island while parole authorities sought him in New Hampshire; the court found implausible Nardi's assertion that he intended to resolve the parole problem while Dubois waited in Rhode Island.

The court also indicated disbelief of Nardi's testimony with regard to his efforts to arrange for Lancellotti to assist Dubois; the court noted contradictions between this testimony and Nardi's statement to the FBI, as well as contradictions between Nardi's testimony and that of Levesque, Lancellotti, and Dubois concerning this transaction.

We are satisfied after reviewing the court's findings and the record that the determination that Nardi was a member of the conspiracy rested on sufficient independent, non–hearsay evidence to meet the *Petrozziello* standard. We therefore reject Nardi's contrary contention.

Nardi goes on to challenge the admission of two particular hearsay statements on the ground that they were made either before or after the conspiracy, and not in the course thereof. One such statement, testified to by Dubois, is a comment MacLeod supposedly made to him sometime during or after the spring of 1976 to the effect that Nardi "was going to be a part of the scheme. That Danny had him under his thumb." Nardi argues that the date the conspiracy began is set by the indictment at March 1, 1977, and that the alleged statement must have been made before that date. Nardi assumes that this testimony was, in fact, received into evidence, and asserts that it created "inherent, irreparable prejudice."

The timing of MacLeod's comment is not, however, clear from Dubois' testimony; the comment could have occurred in the spring of 1976 or it could have occurred at any time thereafter. The precise date the conspiracy actually began is also unclear; the court made no finding on this.

The court purported to admit this statement conditionally, along with the rest of the hearsay testimony, until it could determine whether the requisite showing was made. See *United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir. 1978). Thereafter, in its post–trial memorandum, the court made an explicit finding that the *Petrozziello* requirements had been met with regard to Dubois' testimony generally, but made no

specific mention of the testimony pertaining to MacLeod's challenged comment. This oversight was unfortunate: district courts should be careful to enunciate their ultimate conclusions on contested issues if the conditional admission procedure has been invoked. But we need not determine the exact dates in question, nor need we decide whether the government must prove by independent evidence the existence of the conspiracy on the date of every hearsay statement which it seeks to introduce under the co–conspirator exception. Even assuming a ruling excluding the testimony was in order, the error was clearly harmless. See United States v. Castro, 413 F.2d 891, 894–95 & n. 7 (1st Cir. 1969). Other testimony by Dubois placed MacLeod as present with Nardi at various times when aspects of the conspiracy were discussed, and included remarks by MacLeod indicating knowledge that Nardi was a co–conspirator. The challenged remark was thus at most cumulative. The court, moreover, provided a detailed resume of the evidence on which it rested its judgment; nowhere did it mention the alleged hearsay as figuring in its decision. The court was, of course, entitled to take the challenged testimony under submission, subject to later ruling. Given its cumulative character and the absence of any suggestion that the court relied on it in any way, the lack of a specific exclusionary ruling does not amount to reversible error.

■ The second hearsay statement that Nardi challenges is another alleged comment by MacLeod, supposedly made to Beverly Titus and reported by her to the FBI. Without objection, during cross–examination, defense counsel questioned Titus about a statement of Titus, recorded in an FBI report, that she had talked with MacLeod and others about the bank robberies and that Nardi was not considered a partner in the scheme. Titus' testimony on this point, and the FBI report of her statement, do not indicate the number, if more than one, or date of her conversation with MacLeod, upon which this statement was supposedly based. Over defendant's objection, during redirect examination by government's counsel, Titus was questioned about her state-ment to the FBI, contained in the same FBI report, that MacLeod said to Titus in September 1977 that when the robberies were occurring Nardi knew that Dubois and Levesque were robbing banks. Since the challenged statement of MacLeod to Titus was made after the conspiracy ended, it was not admissible, under the co-conspirator exception, to prove the truth of the matter asserted. The government argues, however, that by inquiring into her statement to the FBI on cross-examination, Nardi "opened the door," so that the government was entitled to place the exculpatory statement in context.

The post–conspiracy statement of MacLeod to Titus received into evidence on redirect examination tended to impeach the statement of Titus to the FBI, received on cross–examination, since the statement received on cross–examination reasonably could be interpreted (a) as saying it was Titus' understanding after her conversations with MacLeod, as well as others, that Nardi was not considered a partner in the scheme, and (b) as implying that MacLeod, along with others, had told her Nardi was not considered a partner. For this limited purpose of impeachment, the post–conspiracy statement of MacLeod was plainly admissible. Fed.R.Evid. 806. Thus, even if Nardi was entitled to have the evidence limited to this purpose, he was not entitled to have it excluded altogether. Moreover, as with the previous statement, the district court did not mention this statement in its opinion, and there is no indication that the court relied on this statement either for its truth or even for the more limited purpose of impeachment. In view of these conclusions, we need not consider whether the challenged post–conspiracy statement of MacLeod to Titus might also be admissible to prove its truth, on the ground that in questioning Titus during cross–examination about her statement Nardi "opened the door." See United States v. Rubin, 609 F.2d 51, 63 (2d Cir. 1979); United States v. Walker, 421 F.2d 1298, 1299 (3d Cir. 1970); United States v. Gorman, 355 F.2d 151, 160 (2d Cir. 1965); 7 Wigmore, Evidence

§§ 2113–2125; *see also United States v. Fortes,* 619 F.2d 108, 121 (1st Cir. 1980); *United States v. Kubitsky,* 469 F.2d 1253, 1255 (1st Cir. 1972).

Finally, Nardi challenges the district court's refusal to admit certain hearsay testimony which he offered in his defense. Two items in particular were excluded; one was a letter dated January 19, 1979, from MacLeod to Stillman Titus, a participant in the conspiracy, in which MacLeod said that Nardi had not done anything that any lawyer would not have done in the same circumstances. The second item was the testimony of Paul Hurley, an inmate in the New Hampshire State Prison from June to October of 1978, concerning unspecified statements made to him by MacLeod during that time at the prison.

Nardi concedes that he is not entitled to introduce these items under the co–conspirator exception; even if he might do so as to statements made during the conspiracy–a question we do not address–these statements were made after the conspiracy ended. He argues, however, that they should have been admitted under the doctrine of "curative admissibility," to rebut previous testimony which Nardi asserts was erroneously admitted. For this proposition, Nardi cites *United States v. Bolin,* 514 F.2d 554, 558 (7th Cir. 1975), and *Wynn v. Lundquist,* 485 F.2d 1085, 1090 (D.Ore.1971).

■ The doctrine of curative admissibility allows a trial judge, in his discretion, to admit otherwise inadmissible evidence in order to rebut prejudicial evidence which has already been erroneously admitted. *See United States v. Winston,* 447 F.2d 1236, 1240 (D.C. Cir. 1971); *United States v. McClain,* 440 F.2d 241, 244 (D.C. Cir. 1971). The doctrine applies, therefore, only when inadmissible evidence has been allowed, when that evidence was prejudicial, and when the proffered testimony would counter that prejudice.

■ Nardi's argument assumes the alleged hearsay evidence previously discussed was not only inadmissible but had prejudicial effect on the court's deliberations.

However, at least the latter of the two statements was admissible, and, as indicated, even if the former were inadmissible it was harmless. It seems likely that the court refused the evidence appellant offered because it saw no profit in pursuing the subject of MacLeod's inconsistent second–hand assertions, none of which it mentioned later in its decision. We see no prejudice to be rebutted, and find the doctrine of curative admissibility to be inapplicable.

### III. The Right to Interview Lancellotti

■ Nardi asserts that he was denied due process and effective assistance of counsel because his counsel were prevented from interviewing Stephen Lancellotti without the presence of government counsel. Nardi cites *Gregory v. United States,* 369 F.2d 185, 188 (D.C. Cir. 1966), and *Coppolino v. Helpern,* 266 F.Supp. 930, 935 (S.D.N.Y. 1967), for the proposition that due process is denied when the prosecution interferes with the right of the defense to interview witnesses.

We do not question the proposition, but find it inapplicable here. We see no indication of interference by the government with Nardi's right to interview Lancellotti. The record shows that Lancellotti chose, of his own accord and on the advice of his own counsel, to speak with defense counsel only in the presence of government counsel. Nardi suggests that Lancellotti was coerced into taking this position by the government's informal grant of immunity, which left the government free to prosecute him if he failed to cooperate in this prosecution. But we see no indication of such coercion in the record; indeed, government counsel indicated to the district court that "the government doesn't care one way or the other" on this issue. We are not disposed to assume bad faith on the part of government counsel in the absence of any specific showing.

### IV. Compulsory Process

■ Nardi's final claim is that he was denied a fair trial because the district court failed to compel Daniel MacLeod to appear

in court and testify for the defense. On the basis of interviews with MacLeod, defense counsel made an offer of proof that MacLeod would, if immunized, testify that he had never discussed the bank robberies with Nardi and that Nardi had had no knowledge of the bank robbery scheme or of the source of the funds he received. Based on this offer of proof and over the government's objection, the district court ordered that MacLeod be granted use immunity for his testimony. Despite this order, MacLeod, who was then imprisoned, indicated through his attorney that he would not testify and even went so far as to indicate that he would not come to the courtroom unless physically compelled. In response to this information, the district court indicated that it would not order the marshals to bring MacLeod into the courtroom. Defense counsel then let the matter drop, saying only that "I don't want to be in a position of waiving our client's rights with respect to this witness and his declination to testify despite the grant of immunity." Defense counsel did not request contempt sanctions against MacLeod.

Nardi now argues, citing *United States v. Sanchez*, 459 F.2d 100, 103 (2d Cir. 1972), that "A defendant is entitled to every assistance which the court can give in compelling the attendance of witnesses and requiring them to give evidence. . . ." He asserts not only that the district court was correct in ordering the grant of immunity for MacLeod, but that the court should have gone further and ordered MacLeod brought to the courtroom and used contempt sanctions to attempt to compel his testimony.

We do not question the principle stated in *Sanchez*. But under these circumstances, we think the district court did as much as it reasonably could to make MacLeod's testimony available to the defense. Some circuits have held that a trial court must or may, in certain circumstances, order immunity for defense witnesses. *See United States v. Davis, supra,* slip op. at 192–193. This court has never directly addressed the issue, and we need not do so here, since the trial court did indicate that it would order immunity and that ruling is not presented

on appeal. When MacLeod refused to testify despite the court's willingness to grant immunity, defense counsel did not suggest that MacLeod be physically compelled to come to the courtroom nor did anyone urge that contempt proceedings be threatened and, if warranted, commenced. The court could properly assume that the defense did not see any possible benefit in forcing matters. The court was not obliged to engage in a gesture which all parties appeared to view, understandably, as futile and disruptive. *See United States v. DeSena,* 490 F.2d 692, 694 (2d Cir. 1973).

*Affirmed.*