UNITED STATES, Appellee,

v.

Luis CANDELARIA–SILVA, a/k/a Candy, Defendant, Appellant.

No. 97–1659.

United States Court of Appeals, First Circuit.

Heard Nov. 2, 1998.

Decided Dec. 10, 1998.

Thomas R. Lincoln, by appointment of the Court, with whom Law Offices of Thomas R. Lincoln was on brief, for appellant.

Grace Chung Becker, Trial Attorney, Narcotic and Dangerous Drug Division, Criminal Division, U.S. Department of Justice, with whom James K. Robinson, Assistant Attorney General, Criminal Division, U.S. Department of Justice, and Theresa M.B Van Vliet, Chief, Narcotic and Dangerous Drug Division, Criminal Division, U.S. Department of Justice, were on brief, for appellee.

Before TORRUELLA, Chief Judge,
LYNCH and LIPEZ, Circuit Judges.

TORRUELLA, Chief Judge.

Following a jury trial, appellant Luis Candelaria–Silva ("Candelaria–Silva") was convicted of conspiracy to possess with intent to distribute and distribution of amounts in excess of fifty grams of cocaine base, five kilograms of cocaine, one kilogram of heroin and an undetermined amount of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) & 846. Candelaria–Silva was additionally convicted on a criminal forfeiture count. On appeal, he raises numerous evidentiary and procedural issues. For the following reasons, we **affirm**.

## BACKGROUND

We review the facts of a criminal case on appeal from a conviction in the light most favorable to the verdict. *See United States v. Gonzalez–Maldonado*, 115 F.3d 9, 12 (1st Cir.1997). We sketch the facts presented at trial, providing further details as they become relevant to the discussion.

Candelaria–Silva belonged to a drug distribution ring led by Israel Santiago–Lugo. Santiago–Lugo's organization distributed heroin (known by the brand name "Cristal"), cocaine powder, crack cocaine, and marijuana. The drugs were distributed at a number of puntos[1]—drug distribution points. Each punto consisted of a supervisor and several employees such as lookouts, vendors, runners, etc.

Candelaria–Silva, along with his mother and two brothers, ran the punto in the Villa Evangelina housing project in Manatí, Puerto Rico.[2] Three members of the Santiago conspiracy—Otero, Román, and Hidalgo—identified Candelaria–Silva as a participant in the Villa Evangelina punto. Candelaria–Silva was in charge of crack capsules, while his

---

1. Translated from Spanish, punto means a "point in time or space." Cassell's Spanish Dictionary 649 (6th ed.1968).

2. Candelaria's two brothers, Eulalio Candelaria–Silva and Moisés Candelaria–Silva, were found guilty in an earlier trial. His mother, Alicia Silva–Maysonet, plead guilty on March 1, 1996.

brothers supervised the distribution of other drugs.

The government presented evidence of Candelaria–Silva's three drug-related arrests. The first arrest occurred on August 19, 1992, at the Villa Evangelina Housing Project in front of Building C, the location of the punto. An officer arrested Candelaria–Silva with ten baggies of cocaine and a marijuana cigarette. During the booking process, Candelaria–Silva indicated that he lived at Villa Evangelina Housing Project T–251 in Manatí. On cross-examination, the arresting officer testified that there is no Building T in the housing project.

On February 14, 1993, an officer arrested Candelaria–Silva at the same location. Upon hearing the approach of the officers' vehicle Candelaria–Silva: (1) ran into an apartment; (2) gave a woman standing there a large brown paper bag; and (3) told her to throw it out in the bathroom. However, the officer seized the bag before she could destroy it. Inside the bag were 100 colorless, transparent heat-sealed plastic ziplock bags. Inside each of these bags were blue, transparent plastic bags which contained cocaine. In addition, there were ten transparent, light blue plastic bags, each containing a vial of crack. The brown bag also contained sixty-two packets of heroin wrapped in aluminum foil with orange colored stickers with black lettering that said "Cristal."

Candelaria–Silva's third arrest occurred on October 31, 1994. At the time of the arrest, Candelaria–Silva was driving a BMW automobile with another passenger. Candelaria–Silva engaged the police car in a chase. At one point, the BMW stopped, and the officer saw a hand holding a firearm extended from an open passenger side car door. Upon seeing the officer's rifle, however, the car sped away. During the subsequent chase, the officer saw a gun and other objects looking like trash and papers being thrown from the vehicle. Although the gun was never recovered, when the car was eventually stopped at a roadblock, the officer seized several bags of marijuana from inside the vehicle.

The government also presented evidence that the Candelaria family used their home to process narcotics and to store weapons.

On November 3, 1993, police officers executed search warrants for the two Candelaria homes located at 30 Sabana Seca Ward, Manatí. In the first home, which belonged to Candelaria–Silva's mother, the officers seized fifty-eight bags of marijuana, thirty-eight bags of Cristal heroin, and 206 bags of cocaine. In the second home, where Candelaria–Silva's brother Eulalio resided, officers seized two pistols.

Again on February 14, 1995, officers executed a set of search warrants on both homes, resulting in the seizure of two kilograms of cocaine, heroin, marijuana, a revolver, a rifle, four AK–47 machine guns, ammunition for the weapons, masks, the cutting agent lactose, scales, envelopes, and vials.

Additionally, the government presented the following evidence of Candelaria–Silva's flight from Puerto Rico. Deputy U.S. Marshal Anthony Visalli testified that he was assigned the task of locating Candelaria–Silva and returning him to Puerto Rico. As part of this investigation, he arrested Candelaria–Silva as he exited his residence in Dorchester, Massachusetts on April 17, 1996. When arrested, Candelaria–Silva stated that his name was Arturo Martínez. Upon being asked for identification, he told the officers it was in his apartment. The officers conducted a protective sweep of the apartment incident to the arrest. After not finding any identification in the apartment, they brought Candelaria–Silva outside, and read him his *Miranda* warnings in Spanish and English. Thereafter, Candelaria–Silva revealed his true identity. In response to Visalli's question regarding whether he understood "what this was all about, did he know that … he was wanted in Puerto Rico," Candelaria–Silva said yes. During a pat-down incident to Candelaria–Silva's arrest, a Deputy Marshal seized Candelaria–Silva's wallet containing: (1) a New York State identification card for Arturo Martínez with a picture of Candelaria–Silva; and (2) a purchase receipt for a roller bed from Dick's Furniture City in Detroit, Michigan on January 12, 1995. The Deputy Marshal also recovered other papers bearing the name of Arturo Martínez.

Candelaria–Silva was brought back to Puerto Rico to stand trial on charges stemming from an indictment returned June 7, 1995.[3] Trial commenced on October 21, 1996. On October 29, 1996, a jury found Candelaria–Silva guilty on two counts: the narcotics conspiracy count and a criminal forfeiture count. On March 13, 1997, the district court sentenced Candelaria–Silva to 200 months imprisonment, followed by a five year term of supervised release, along with a $50 special assessment.

## DISCUSSION

### I. Rule 12(d) Claim

Candelaria–Silva argues that the district court abused its discretion in admitting evidence of his Dorchester arrest, including testimony about his attempt to use a false name, because the government failed to meet the notice requirements of Fed.R.Crim.P. 12(d). We find his argument without merit.

Fed.R.Crim.P. 12(d)(2) provides that:

At the arraignment or as soon thereafter as is practicable the defendant may in order to afford an opportunity to move to suppress evidence under subdivision (b)(3) of this rule, request notice of the government's intention to use (in its evidence in chief at trial) any evidence which the defendant may be entitled to discover under Rule 16 subject to any relevant limitations prescribed in Rule 16.

■ To establish a discovery violation under Rule 12(d)(2), a defendant must prove that the alleged violation prejudiced his case. *See United States v. de la Cruz–Paulino*, 61 F.3d 986, 993 (1st Cir.1995). Rule 12(d) is a matter of procedure, rather than a rule designed to ensure fairness at trial. *See id.* As we have stated in the past, the rule serves to: (1) afford the defendant an opportunity to move to suppress evidence under Rule 12(b)(3); and (2) avoid the necessity of the defendant moving to suppress evidence which the government does not intend to present. *See id.* Rule 12(d) differs from discovery rules designed to ensure fairness in that it

was not designed to aid the defendant in ascertaining the government's trial strategy. *See id.* The advisory committee's notes state that no sanction is provided for a violation of Rule 12(d)(2) because automatic exclusion would be too harsh a remedy given the opportunity for discovery under Rule 16. *See id.* at 995 n. 6.

■ Prior to trial, Candelaria–Silva filed an omnibus discovery motion. On October 21, 1996, the prosecutor gave Candelaria–Silva's counsel a copy of an April 17, 1996 report prepared by the Deputy Marshal who arrested the appellant in Dorchester. The government admits that its designation of flight evidence was belated.

Although appellant's counsel initially gave the district court the impression that he was arguing that the false name was an involuntary statement under 18 U.S.C. § 3501, *see* Tr. 10/23/96 at 449 (district court stating "[y]ou did not mention the rule, that's the impression you gave me before"), he eventually contended that Fed.R.Evid. 403 prohibited introduction of the arrest as evidence of flight. *See id.* at 456. The district court heard and responded to the defendant's arguments. *See* Tr. 10/24/96 at 591–612. Moreover, counsel for Candelaria–Silva explicitly stated that "I don't think they have to designate the evidence under Rule 12(d)(2)." *See* Tr. 10/23/96 at 452. Candelaria–Silva had numerous opportunities to raise his arguments relating to suppression, and thus, the purpose of Rule 12(d)—to afford the defense a chance to move to suppress evidence under Rule 12(b)(3)—has been satisfied.

■ Proof positive of the "if at first you don't succeed" adage, Candelaria–Silva now argues that the items could have been suppressed as the fruits of an illegal search because the Deputy Marshal testified on cross-examination that he entered Candelaria–Silva's apartment as part of a protective sweep. As an initial matter, we note that the district court was inclined just to admit into evidence the false identification card found in

---

**3.** Candelaria–Silva was one of thirty-one defendants named in the indictment, but was a fugitive while the indictment was pending and during the

first two trials relating to the indictment. As a result, he was tried alone in the third trial.

Candelaria–Silva's wallet during the pat-down incident to his arrest. *See* Tr. 10/24/96 at 643. Incredibly, it was actually Candelaria–Silva who requested the admission of: (1) the additional items found in the wallet, including a receipt for a bed from a Detroit store dated January 12, 1995, *see id.* (Candelaria–Silva's counsel stating: "Oh, no, to me the documents inside the wallet are important."); and (2) envelopes found in his apartment with a return address in Detroit, Michigan. *See id.* at 644–647 (Candelaria–Silva's counsel stating: "I don't have a problem [with admitting the envelopes into evidence].").

Since Candelaria–Silva did not raise the Rule 12(b)(3) issue in the trial court, he cannot successfully litigate it on appeal. *See United States v. DeLutis*, 722 F.2d 902, 909 (1st Cir.1983). Further, there is no chance of Candelaria–Silva's proving that the alleged violation prejudiced his case thereby warranting a reversal under *Cruz–Paulino*, since he himself sought admission of the evidence to corroborate his theory that he was in the continental United States prior to the return of the indictment.

## II. Rule 16 Violation

Candelaria–Silva argues that the district court abused its discretion in failing to exclude evidence that he gave a false name when he was arrested in Dorchester because of the government's delayed disclosure of the arrest report. The discovery obligations set forth in Fed.R.Crim.P. 16 are designed:

> to contribute to the fair and efficient administration of justice by providing the defendant with sufficient information upon which to base an informed plea and litigation strategy; by facilitating the raising of objections to admissibility prior to trial; by minimizing the undesirable effect of surprise at trial; and by contributing to the accuracy of the fact-finding process.

*Id.* (advisory committee note).

■ The district court has broad discretion to address discovery violations in light of their seriousness. *See United States v. Josleyn*, 99 F.3d 1182, 1196 (1st Cir.1996), *cert. denied sub nom. Billmyer v. United States*, — U.S. —, 117 S.Ct. 959, 136 L.Ed.2d 845

(1997). This Court will not grant the "draconian relief" of suppression and reversal when it is "grossly disproportionate both to the prosecutor's nonfeasance and any prejudice to the defense." *Id.*

Candelaria–Silva's failure to request a continuance resolves his delayed discovery claim. As we have previously stated:

> When discovery material makes a belated appearance, a criminal defendant must ordinarily seek a continuance if he intends to claim prejudice.... As a general rule, a defendant who does not request a continuance will not be heard to complain on appeal that he suffered prejudice as a result of late-arriving discovery. Thus, in situations where defense counsel does not seek a continuance upon belated receipt of discoverable information, a court often can assume that counsel did not need more time to incorporate the information into the defendant's game plan.

*United States v. Sepulveda*, 15 F.3d 1161, 1178 (1st Cir.1993) (citations omitted). Because Candelaria–Silva never requested a continuance, we need proceed no further.

## III. Rule 404(b) Claim

Candelaria–Silva argues that the district court erred in admitting evidence that Carlos Morales–García, a passenger in the car driven by Candelaria–Silva on October 31, 1994, brandished and discarded a handgun during a car chase. We find no such error.

■ Because the admission of Rule 404(b) evidence is committed to the sound discretion of the trial judge, we will reverse only for abuse of discretion. *United States v. Manning*, 79 F.3d 212, 217 (1st Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 147, 136 L.Ed.2d 93 (1996).

■ Fed.R.Evid. 404(b) bars the admission of evidence of "other crimes, wrongs, or acts if used to prove the character of a person in order to show action in conformity therewith." Rule 404(b) provides that although evidence of other crimes, wrongs, or acts is not admissible to prove criminal propensity, it may be admissible for other purposes that do not involve character, such as

proof of intent, preparation, knowledge, or absence of mistake. *See Manning*, 79 F.3d at 217. Moreover, when charges of drug trafficking are involved, this Court has often upheld the admission of evidence of prior narcotics involvement to prove knowledge and intent. *See id.*

Here, the evidence of the arrest was intrinsic to the conspiracy charge, and consequently, does not fall within the purview of Rule 404(b). *See id.* ("Evidence intrinsic to the crime for which the defendant is on trial, accordingly, is not governed by Rule 404(b)."). The car chase evidence was properly admitted as probative of: (1) Candelaria–Silva's participation in the drug conspiracy because there was marijuana in the car that he was driving; (2) his residence at 30 Sabana Seca Ward, Manatí—the address given on the arrest report; and (3) his consciousness of guilt since Morales was also present with Candelaria–Silva in Dorchester. Accordingly, we see no error in the admission of the above evidence.

## IV. Rule 401 and 403 Claims

Candelaria argues that the district court erred under Federal Rules of Evidence 401 and 403 in admitting evidence of: (1) his flight to Dorchester; and (2) the February 14, 1995 seizures from the family homes located at 30 Sabana Seca. Neither claim is persuasive.

### A. The Seizures

■ Fed.R.Evid. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* "Evidence may be 'relevant' under Rule 401's definition, even if it fails to prove or disprove the fact at issue—whether taken alone or in combination with all other helpful evidence on that issue." *United States v. Schneider*, 111 F.3d 197, 202 (1st Cir.1997).

■ Candelaria–Silva contends that the February 14, 1995 seizure should have been excluded because: (1) the link between him and 30 Sabana Seca was too attenuated; and

(2) the evidence seized was inconsistent with the drug distribution methods of the Santiago–Lugo conspiracy. Neither claim has merit.

There are at least four reasons why the link between Candelaria–Silva and 30 Sabana Seca is not too attenuated. First, he concedes, both in his brief and at oral argument, that he maintained an auto body shop at the residence. Second, the address was the residence of multiple members of the Candelaria–Silva family—including his mother and brothers—who were convicted or pled guilty to being part of the Santiago conspiracy. Third, shortly before the search, Candelaria–Silva gave the address to a police officer while being booked after an arrest. Fourth, a co-conspirator testified that he saw Candelaria–Silva at the address while delivering shipments of cocaine. Candelaria–Silva's argument that there is little to connect him to 30 Sabana Seca is thus disingenuous.

Candelaria–Silva further contends that the seizure was irrelevant because the evidence seized was inconsistent with the drug distribution methods of the Santiago conspiracy—i.e. "Cristal" stickers were not affixed to the decks of heroin that day and the cocaine seized was in different quantities than a co-conspirator said he had delivered at a previous time. This argument overlooks the government's proof that: (1) the Santiago conspiracy distributed powder cocaine, crack cocaine, heroin and marijuana; (2) the homes were used to package and store narcotics for sale at the Villa Evangelina punto; (3) Candelaria–Silva's previous arrests involved each of the four types of narcotics distributed by the Santiago organization; (4) Candelaria–Silva was previously arrested with 62 packages of "Cristal" heroin—the logo of the Santiago conspiracy; and (5) Cristal heroin had been previously seized from the location. We see no reason why the evidence was not admissible under Rule 401.

In addition, Candelaria–Silva contends that the district court abused its discretion under Fed.R.Evid. 403 in admitting testimony and photographs of firearms, guns, drugs, and drug paraphernalia seized on February 14, 1995.

Rule 403 provides that "[a]lthough relevant, evidence may be excluded if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.*

■ Obviously, evidence presented by the government is prejudicial to the defendant's interests. If it were not, the prosecution would not be introducing it. That is why the "law protects a defendant against *unfair* prejudice, not against *all* prejudice." *United States v. Rivera–Gomez,* 67 F.3d 993, 997 (1st Cir.1995) (emphasis in original). "The admitted evidence must not only be prejudicial, but be unfairly prejudicial, and not only outweigh relevance but substantially outweigh relevance." *United States v. Rivera,* 83 F.3d 542, 545 (1st Cir.1996). In conducting this balancing test, the district court has "especially wide latitude," *Rivera–Gomez,* 67 F.3d at 997, and "Rule 403 tilts the balance in favor admission." *Rivera,* 83 F.3d at 545.

■ There was nothing improper with the admission of the masks, firearms, and narcotics evidence. First, most of the evidence from the seizures was presented to the jury via photographs thereby reducing the prejudicial effect. Second, we cannot say the district court abused its discretion under Rule 403; the evidence was relevant and its admission not substantially outweighed by the Rule 403 factors. In addition, we note that defense counsel, on the losing side of a Rule 403 argument, always has the option of asking for a limiting instruction "that the evidence should be considered not to show the character of the defendant, but only as proof of intent, operation, plan, knowledge or absence of mistake or accident." *United States v. Cresta,* 825 F.2d 538, 554 (1st Cir. 1987). We hold that the probative value of the evidence—in establishing Candelaria–Silva's involvement in a far ranging narcotics conspiracy—outweighed its prejudicial effect.

**B. Evidence of Flight**

■ Evidence of a defendant's flight and attempts to conceal or falsify identity may be presented at trial as probative of a guilty mind if there is an adequate factual predicate creating an inference of guilt of the crime charged. *See United States v. Tracy,* 989 F.2d 1279, 1286 (1st Cir.1993) (citations omitted), *cert. denied,* 508 U.S. 929, 113 S.Ct. 2393, 124 L.Ed.2d 294 (1993).

■ Candelaria–Silva's contention is that the adequate factual predicate is missing in this case because he left Puerto Rico prior to the return of the indictment on February 9, 1995. He alleges that he left Puerto Rico in late 1994 because he was afraid that his probation would be revoked as a result of his October 31, 1994 arrest. In substantiating this proposition, Candelaria–Silva relies on a receipt in his possession at the time of his arrest in Dorchester for a bed purchased in Detroit, Michigan on January 12, 1995.

This receipt does not conclusively prove Candelaria–Silva's continuous presence in the continental United States prior to the return of the indictment. It is conceivable that Candelaria–Silva visited Detroit, returned to Puerto Rico, and then, upon learning of the indictment, fled to Dorchester. *See United States v. Amuso,* 21 F.3d 1251, 1258 (2d Cir.1994) ("The fact that a defendant's flight is subject to varying interpretations does not lead inevitably to the conclusion that the district court abused its discretion in admitting flight evidence.").

Here, there was an adequate factual predicate to admit evidence of flight and Candelaria–Silva's continued absence. Candelaria–Silva admits that he fled because he was afraid that his probation would be revoked as a result of the October 31, 1994 arrest—an arrest predicated upon conduct that constitutes part of his participation in the conspiracy. Further still, he attempted to conceal his whereabouts by creating a new identity. He obtained a false identification card in the name of Arturo Martínez, rented an apartment under that name, and applied for credit using that name. *See United States v. Ortiz–Arrigoitia,* 996 F.2d 436, 440 (1st Cir. 1993) (establishing that a defendant's attempt to conceal his identity may be relevant evidence of his guilt); *United States v. Boyle,* 675 F.2d 430, 432 (1st Cir.1982) (stating that use of a false name after the commission of a

crime is commonly accepted as being relevant on the issue of consciousness of guilt).

Most importantly, Candelaria–Silva admitted to the Deputy Marshal after his arrest that he knew he was wanted in Puerto Rico. *See* Tr. 10/24/96 at 617. Based on the above information, there was an adequate factual predicate creating an inference of guilt of the crime charged. Moreover, any danger that the jury may have given undue weight to the flight evidence was cured by the district court's use of this instruction which emphasizes that flight alone is insufficient to sustain a conviction, and that many innocent people flee. Consequently, the district court did not abuse its discretion to admit this evidence under Rule 403.

## V. Coconspirator Statements

Candelaria–Silva argues that the following statements should have been excluded as inadmissible hearsay: (1) testimony of José Román–Freites, a manager of the Los Murales punto in Manatí, that Candelaria–Silva was selling crack, and that Santiago was supplying drugs other than heroin at the Villa Evangelina punto; and (2) the entire cross-examination testimony of Marcos Hidalgo, a government witness in two prior trials. We disagree.

### A. Román–Freites

■■■■ Federal Rule of Evidence 801(d)(2)(E) excludes from the operation of the hearsay rule "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." It is not necessary for the indictment to charge a conspiracy in order to admit coconspirators' statements under Rule 801(d)(2)(E). *See United States v. Campa*, 679 F.2d 1006, 1011 (1st Cir.1982). Whether or not a conspiracy has been charged, such statements are admissible if the district court finds that "it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977). In this circuit, the district court's ultimate finding on

such a matter has come to be called a "*Petrozziello* determination."

■■■■ The proper procedure for admitting or rejecting coconspirator statements is set forth in *United States v. Ciampaglia*, 628 F.2d 632, 638 (1st Cir.1980), *cert. denied*, 449 U.S. 1038, 101 S.Ct. 618, 66 L.Ed.2d 501 (1980). It requires that the district court make its *Petrozziello* determination "at the close of all the evidence." *Id.* If the defendant fails to offer a timely objection, then the conviction can only be vacated if the record reveals plain error. *See United States v. Ortiz*, 966 F.2d 707, 715 (1st Cir.1992).

■■■■ Here, Román–Freites testified that Candelaria–Silva was in charge at the Villa Evangelina punto and that heroin, cocaine, crack, and marijuana were sold there. Defense counsel twice objected when Román–Freites testified that Candelaria–Silva was selling crack at the punto on the grounds that the government failed to elicit the source of Román–Freites' knowledge. The government inquired, and Román–Freites explained that he had been promised by Santiago–Lugo that he would be the sole distributor of Santiago–Lugo's narcotics in Manatí. After hearing that Cristal heroin was being sold at Villa Evangelina, Román–Freites went to the punto to confirm the information. During his visit, he learned from "a kid" named El Canito, who was selling cocaine there, that Santiago–Lugo's heroin was being sold there. He testified about his discovery that Santiago–Lugo was selling heroin, cocaine, marijuana and crack at the Villa Evangelina punto. Defense counsel failed to raise any hearsay objections to this testimony.

At the close of the government's case and again at the close of Candelaria–Silva's case, the district court made the requisite *Petrozziello* findings. At this point, Candelaria–Silva again failed to object specifically to Román–Freites' testimony on the ground that El Canito was not a member of the Santiago–Lugo organization or that the statement was not made in furtherance of the conspiracy.

For *Petrozziello* purposes, the critical juncture is the close of all the evidence. *See*

*Ortiz,* 966 F.2d at 716. At that juncture in this case, Román–Freites' testimony went unremarked. Under such circumstances, we can vacate the defendant's conviction on this ground only if the record reveals plain error. *See id.* No such error is apparent in this case.

### B. Hidalgo

■ Candelaria–Silva complains that the government improperly elicited hearsay during its cross-examination of Hidalgo. The district court did not err in allowing the government's questions.

Here, defense counsel improperly asked Hidalgo about comments around town with respect to the activities in which Eulalio and Moisés Candelaria–Silva were involved. By limiting his questions to these two brothers, defense counsel elicited that these two brothers were in charge of distributing drugs at Villa Evangelina. Then, defense counsel asked a broader question about what the witness had heard about their brother Candy, to which Hidalgo answered only that Candy was their brother. Thus, this portion of the direct examination resulted in inadmissible hearsay, and left the jury with the incorrect impression that Candelaria–Silva was not involved in his brothers' drug distribution activities. In light of this, the district court reasonably permitted the government to question the witness about whether Candelaria–Silva was also known to have participated in his brothers' activities at the punto. Thus, the district court properly employed the doctrine of curative admissibility to admit otherwise inadmissible evidence in order to rebut prejudicial evidence which already had been erroneously admitted. *See United States v. Nardi,* 633 F.2d 972, 977 (1st Cir.1980) (citations omitted).

### VI. Jury Instruction

■ Candelaria–Silva contends that the district court should have instructed the jury not to infer guilt from flight unless it found that the government had proved beyond a reasonable doubt that Candelaria–Silva was aware that he had been accused.

At trial, the district court gave the following instruction on flight evidence:

Intentional flight or intentional hiding or evasion by a defendant after he is accused of the crime for which he is now on trial, may be considered by you in light of all the other evidence in the case. On this issue, like other matters of evidence, the government has the burden of proof. Intentional flight or intentional hiding or evasion after a defendant is accused of a crime is not alone sufficient to conclude that the defendant is guilty. Flight, hiding or evasion, does not create a presumption of guilt. At most, it may provide the basis for an inference of consciousness of guilt. But flight, hiding or evasion may not always reflect feelings of guilt. Moreover, feelings of guilt, which are present in many innocent people, do not necessarily reflect actual guilt. In your consideration of this type of evidence you should consider that there may be reasons for defendant's actions that are fully consistent with innocence.

It is up to you as members of the jury to determine whether or not evidence of intentional flight or intentional hiding or evasion shows a consciousness of guilt and the weight or significance to be attached to any such evidence.

Tr. 10/29/96 at 1089–90. Although the model jury instruction merely uses the phrase "intentional flight," the district court employed the additional language "intentional flight or intentional hiding or evasion" to reflect that Candelaria–Silva may have fled prior to the return of the indictment and that his continued absence after he was aware of the charges against him would be a potential basis to infer consciousness of guilt. Despite Candelaria–Silva's objection, the instruction was properly tailored to the facts of this case.

### VII. Judicial Bias

■ Candelaria–Silva contends that the "district court overstepped its bounds and assumed the role of an advocate for the prosecution, constantly interjecting in a manner that indicated annoyance and bias against [ ] counsel, preventing appellant from having a fair trial." Candelaria–Silva Br. at 50. He then argues that "space limitations do not allow," *id.,* for a complete listing of all such instances of inappropriate judicial con-

duct. On those occasions in which the lack of paper or failure to recount one instance of judicial bias prevents counsel from arguing his point, our words in *United States v. Zannino,* 895 F.2d 1 (1st Cir.1990), are most appropriate:

> [I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.... Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.

*Id.* at 17 (internal quotation marks and citations omitted). We resist counsel's request that we conduct "a reading of the entire record with care," Candelaria–Silva's Br. at 50, as a task that should have been completed by him in the first place.

### CONCLUSION

For the reasons stated in this opinion, we affirm.