FILED

02/25/2020

Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 3, 2019 Session

**STATE OF TENNESSEE v. ALEXANDER R. VANCE
AND DAMONTA M. MENEESE**

**Appeal by Permission from the Court of Criminal Appeals
Criminal Court for Davidson County
No. 2014-C-2274    J. Randall Wyatt, Jr., Judge**

_____

**No. M2017-01037-SC-R11-CD**

_____

We granted permission to appeal to the Defendant, Alexander R. Vance,[1] to determine whether the trial court committed reversible error by permitting the State to elicit testimony about a statement made by a non-testifying codefendant whose trial was severed and whose statements were the subject of a motion in limine the trial court had granted. The trial court permitted the testimony after determining that defense counsel had "opened the door" during cross-examination and that the doctrine of curative admissibility permitted the testimony in order to correct a misleading impression created by the cross-examination. The defense objected to the testimony on various grounds. Those grounds did not include constitutional claims under the state and federal confrontation clauses.[2] After the close of proof, the jury convicted the Defendant of one count of second degree murder, an alternative count of first degree felony murder, especially aggravated robbery, and three counts of aggravated assault. The trial court merged the second degree murder conviction into the first degree murder conviction and imposed an effective sentence of life imprisonment plus twenty-one years. In his motion for new trial, the Defendant reiterated his arguments against the admission of the "curative" testimony and raised for the first time a contention that the testimony violated his constitutional rights of confrontation. The Court of Criminal Appeals affirmed the trial court's judgments. Applying plain error review to the Defendant's constitutional claims, we hold that, while the trial court erred in admitting the contested testimony, substantial justice does not require that plain error relief be granted. We also hold that

---

[1] The codefendant Damonta M. Meneese is not a party to this appeal.

[2] The United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. The Tennessee Constitution provides that, "in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face . . . ." Tenn. Const. art. I, § 9.

1

the Defendant is not entitled to relief on the claims he preserved for plenary review. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

**Tenn. R. App. P. 11 Appeal by Permission;**
**Judgment of the Court of Criminal Appeals Affirmed**

JEFFREY S. BIVINS, C.J., delivered the opinion of the Court, in which CORNELIA A. CLARK, SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

David A. Collins, Nashville, Tennessee, for the appellant, Alexander R. Vance.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Sarah K. Campbell, Special Assistant to the Solicitor General and the Attorney General; Glenn R. Funk, District Attorney General; and Amy Hunter, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**Factual and Procedural Background**

As a result of the December 2012 homicide of Stephen Milliken, the Defendant was indicted in August 2014 with codefendants Joshua LaShawn Meneese and Damonta M. Meneese[3] on one count of first degree premeditated murder; one (alternative) count of first degree felony murder; one count of especially aggravated robbery; and three counts of aggravated assault.

Prior to trial, Joshua's trial was severed. Counsel for the Defendant filed a motion in limine to prevent the State from adducing during trial any of Joshua's statements "relative to any alleged involvement of [the Defendant] in this offense." As grounds, the motion asserted that

> [t]he mental state of Joshua Meneese i[s] unknown at the present time. Therefore, whether or not any words uttered by him would be considered competent testimony is unknown. Defendant Vance submits that should he be allowed to testify, that the defendant would have the right to call any and all doctors who have participated in the testing of Mr. Meneese as well as to call rebuttal experts if necessary.

At the hearing on this motion, the State acknowledged that Joshua "did make a statements [sic]." The State also asserted that it did not expect to call Joshua as a witness

---

[3] Because both of the Defendant's codefendants share a last name, we will refer to them by their first names to avoid confusion. Because Joshua was known to the victims as "Neno," we also will refer to him by that nickname when appropriate. We intend no disrespect.

2

and that it was not planning to introduce his statements. The trial court granted the motion.

The Defendant and Damonta proceeded to a jury trial, held in mid-November 2016. Prior to the presentation of any proof, the prosecutor read the indictment to the jury, including the names of all three charged defendants. After the prosecutor concluded, the trial court advised the jury as follows:

> Members of the jury, you heard as the Assistant District Attorney Hunter was stating and reading the indictment that there was a name of Joshua LaShawn Meneese that was read and I think I mentioned to you earlier but a severance, a severance has been taken as to that defendant and you would need only to consider the law and evidence as it would apply to Damonta Meneese and Alexander Vance in your deliberations later on. I just wanted to mention that.
>
> That was read in that that was originally charged, but he is not being tried at this time.[4]

The following proof was then adduced.

On the night of December 26, 2012, the eighteen-year-old murder victim, Stephen Milliken, arranged to sell some studio equipment. He loaded the equipment into the trunk of the car belonging to his girlfriend, Jalisa Harris. Also accompanying the victim were his older brother, Christopher Holt, and a friend, Prince Myles. Mr. Myles was also Ms. Harris' roommate. Ms. Harris drove the car to Trinity Hills Apartments in Nashville, Tennessee, to meet the buyer. The victim sat in the front passenger seat, Mr. Holt sat behind the victim, and Mr. Myles sat behind Ms. Harris.

When they first arrived at the meeting place, the expected buyer was not there. They drove to a nearby gas station, and the victim made a phone call. Assured by the person the victim called that the sale was still on, the four drove back to the apartment complex. There, in an area where the street lights were not working, they saw several individuals standing in front of the breezeway. Ms. Harris later identified one of these persons as Joshua, who was known by the nickname "Neno." She explained that she knew Neno because he was friends with Mr. Myles and came to her apartment frequently. She also recognized one of the other men as one of Joshua's brothers, whom she had heard was called "Monte." When asked to identify Damonta at trial, she said she thought

---

[4] The jury instructions also included a paragraph following the recitation of the charged offenses providing that "[t]he indictment also charges JOSHUA LASHAWN MENEESE with these same offenses, however, a severance has been granted as to this defendant and you are to consider the law and the evidence only as to the defendants ALEXANDER R. VANCE and DAMONTA M. MENEESE in this trial."

the codefendant was Damonta but was not sure because it had been so long since the encounter. She clarified that she had been given Damonta's name by Mr. Myles. She did not recognize the third man and did not get a good look at him. She stated that both Damonta and the third man had been wearing hoodies with the hoods up.

During the encounter, Neno approached one of the car's windows and spoke with Ms. Harris. The victim and Mr. Myles got out of the car and went to the trunk. Ms. Harris popped the trunk open, obscuring the view of what was occurring behind the car. Damonta and the third man also went behind the car.

Ms. Harris testified that she then saw the victim lying on the ground, on his stomach, but added that she could not see everything that was happening. After about two minutes, she saw Mr. Myles backing up to her side of the car with his hands up. She heard him saying "something along the lines of like y'all are doing this to me too," which she described as "I guess just kind of pleading his case." She saw the third man pointing a gun at Mr. Myles. She later saw Neno waving a gun as he walked up the breezeway.

Ms. Harris testified that, when the victim got back in the car, "he said that they had robbed him. That was the first thing he said." She added that, when the victim got out of the car, he had his cell phone but that when he returned to the passenger seat, he no longer had his phone. She did not know if anything else was taken from him, but added that "they" took the studio equipment.

Ms. Harris heard Mr. Myles arguing with the men but could not tell what they were saying. Mr. Myles then got back into the rear left passenger seat. As she started to pull away, she heard Neno say from the breezeway, "Shoot them, Cuz, shoot at them Cuz." She heard gunshots and felt them hitting the car, so she sped off. She stated that she heard "at least five" gunshots.

When she realized that the victim had been shot, she drove directly to Skyline Hospital, a short distance away. She later spoke with the police and gave them permission to search her car and "do whatever they needed to do" with it. She later identified Neno from a photographic array. Shown another array that did not contain photographs of Neno, Damonta, or the Defendant, she did not identify anyone but told the officer that the person depicted in photograph number four looked "most like the person she saw because of his eyes" and that she knew the person's name was "Alex because Prince Myles called his name." Shown a photographic array containing the Defendant's photograph, she did not make an identification. Shown a photographic array containing Damonta's photograph, she did not make an identification.

On cross-examination, Ms. Harris acknowledged that she told officers on that night that she did not know anyone other than Neno, but clarified that she had seen Damonta before but did not know his name. She reiterated that she got the name

4

"Damonta" from Mr. Myles. Asked if "the majority of [her] knowledge about the inner-workings of this case came from Prince Myles," she answered, "Yes." On redirect, she clarified that, by her answer, she meant "[t]he names." She also stated that, as far as she could tell, the victim and Mr. Myles had been close friends.

The victim's older brother, Mr. Holt, also testified at trial. He explained that the victim wanted to sell his studio equipment for $200 in order to buy some steel-toed boots for a new job. Asked if he knew to whom the victim was planning to sell his equipment, he answered, "As far as I knew it was just, it was Neno and his people . . . ." He knew of Neno from having previously seen him "a couple of times."

Mr. Holt testified that, after they arrived at the apartment complex, Neno spoke with Ms. Harris. She popped the trunk, and Neno, "that guy right there," and a third man went to the back of the car. He identified Damonta at trial as "that guy right there." Asked if he saw the third person in the courtroom, he responded, "Naw. I couldn't identify him."

The victim and Mr. Myles got out of the car and joined the men at the back of the car. Mr. Holt stated that the men took the studio equipment out of the car, and he thought "they took the equipment in the house." After several minutes had passed with the victim behind the car, Mr. Holt became worried and was preparing to get out of the car. He then saw the victim's shadow, and the victim got back into the front passenger seat of the car. The victim said, "Man, what about these n*****s just robbed me . . . ." Mr. Holt then started to get out of the rear left passenger door, which Mr. Myles had left open, when he saw someone backing Mr. Myles up to the car. Mr. Myles was protesting, "[M]an, that's f*cked up. We f*ck with y'all. How the f*ck y'all going to do us like that?" Someone responded, "[M]an, get you're a** in the car . . . ." When Mr. Myles got in the car, Mr. Myles told Ms. Harris, "[D]rive off, drive off, drive off." Mr. Holt testified that, as soon as they drove off, "they shot out the back window." When he looked back, he saw two people standing there. He saw a third person standing on the stairwell in the breezeway. He identified this third person as Neno. Mr. Holt testified that, as they were driving off, he heard Neno yell, "shoot at them n*****s." According to Mr. Holt, "that is when the shots rang out."

Mr. Holt recalled hearing seven or eight gunshots. When the shots were fired, he leaned up and over the front passenger seat to try and cover the victim. When he realized that the victim had been shot, they rushed to Skyline Hospital. Neither he, Ms. Harris, nor Mr. Myles had been hit by the bullets.

On December 28, 2012, and January 3, 2013, Mr. Holt identified Neno from photographic arrays. Shown an array containing a photograph of the Defendant on January 28, 2013, Mr. Holt did not make an identification. Mr. Holt identified Damonta

5

from a photographic array shown to him on May 3, 2014. He had not seen an array containing Damonta's photograph prior to that time.

On cross-examination by Damonta's lawyer, Mr. Holt stated that, after their first stop at the apartment complex, Mr. Myles called someone named "Brian" and "then it ended up with them calling [the victim's] phone." After the phone call, the victim decided to return to the complex in order to complete the sale. Mr. Holt acknowledged that he did not mention Damonta by name or describe him as Neno's brother to the police on the night of December 26, 2012. He reiterated that he heard someone yell to shoot but acknowledged that he learned the identity of the voice from Ms. Harris while they were at the hospital.

On cross-examination by the Defendant's lawyer, Mr. Holt acknowledged that the two men other than Neno were wearing hoodies with the hoods up. Mr. Holt testified that he heard Neno say the name "Alex" during the encounter. He stated that the victim told him that one of his assailants had gone through his pockets.

The victim had been struck by a single bullet. He was transferred from Skyline Hospital to Vanderbilt and was pronounced dead several hours later. The cause of death was the gunshot. A nine millimeter caliber bullet was recovered from the victim's body.

Officers responded to the scene of the shooting and recovered eight nine millimeter shell casings, later determined to have all been fired from the same gun. The responding officers were unable to locate any eyewitnesses at the apartment complex. No weapon associated with the shooting was recovered. The studio equipment was not recovered. Fingerprints collected from Ms. Harris' car did not match those of either Damonta or the Defendant. The victim's clothing was tested for DNA, but the results did not match either Damonta or the Defendant. No forensic evidence connecting the Defendant to the offenses was presented.

The State called Mr. Myles to testify. Because of Mr. Myles' repeated assertions that he could not remember "exactly what happened that day," the trial court allowed the jury to hear Mr. Myles' previously recorded statements given to law enforcement. Police officers had recorded several interviews with Mr. Myles, including one on December 26, 2012, one on January 4, 2013, and one on May 3, 2014.

During the December 26, 2012 interview, Mr. Myles stated that he did not know the names or nicknames of the two men that robbed the victim at the car. He stated that both men pulled guns, but he did not know which one fired the shots. He described one of the men as light-skinned with a cross tattooed on his face. He stated that this man had braids and weighed about 220 pounds. He described the other man as dark-skinned with tattoos all over his face. The men took the victim's cell phone out of the victim's pocket. Mr. Myles asked to see line-ups so that he could identify the two men.

6

Early in the interview, Detective Stanley Truitt told Mr. Myles that, if the victim died, it was possible that Mr. Myles could be charged with murder. In response, Mr. Myles stated that he did not know that the victim was going to be robbed. He stated that the assailants robbed the victim but not him. He explained that the victim's phone had "their" phone number. He repeated that he did not know the assailants' names or nicknames. Mr. Myles added that the men knew him, but stated that he did not know why or how. He explained that he associated with "crips" but did not "mess with bloods."

During the interview conducted on January 4, 2013, Mr. Myles again asked to see photographs of suspects. Shown a photographic array, he identified Neno's brother, Damonta, as being at the scene. He stated that Damonta had a black gun and that the third man had a metal, shiny gun. Damonta told him and the victim, "Don't move." Mr. Myles did not know who fired the gunshots. He stated that the first shot blew out the car's rear window and the remaining shots hit the trunk.[5]

Shown another array, he identified Neno but said he did not see Neno at the scene. He reiterated that Ms. Harris had seen Neno there. Mr. Myles heard someone screaming, "shoot 'em." He stated that Ms. Harris told him that Neno was at the top of the steps saying "shoot 'em." Mr. Myles stated that he knew Neno and knew that Neno had multiple brothers. He had not seen Neno since the shooting. He added that, in the past, he had sold drugs with Neno but about a month previously, he and Neno had had a falling out because Neno was not paying his share of the rent.

Asked about the third man, Mr. Myles stated that he had never seen him before. Mr. Myles described the third person as "big," like a "body builder," with a tattoo of a cross on his face. He described this man as having braids, like corn-rows, and thought this man was approximately nineteen or twenty years old. This third man was the one who told the victim to get on the ground.

Mr. Myles stated that he was afraid of being identified and targeted. He said that, after his earlier interview, the website "nashville.gov" contained information that implicated him as an informant. He expressed concerns that the police department had released information that placed him and his family in danger. He stated that he did not want to testify. When told that he would have to testify, Mr. Myles stated that he was not going to get on the witness stand. He stated, "I ain't talkin' no more" and left the room.

The recorded interview conducted on May 3, 2014, took place after Mr. Myles had been arrested and was in custody for an unrelated crime. Mr. Myles began the interview by attempting to get Detective Andrew Davis to assist him in getting his bond lowered so that he could avoid being kept in jail. Two more officers became involved and explained

---

[5] The subsequent forensic examination of the car did not reveal gunshots to the trunk.

7

to Mr. Myles that his cooperation in the instant case would be reported to the district attorney. Mr. Myles stated that he knew the names of all three of the men involved in the December 26 incident. He added that he would not sign his name to a photographic array identifying anyone because his life was put in danger the last time he did so.

Nevertheless, the officers showed Mr. Myles a photographic array, and he stated that he recognized all six of the men portrayed. He stated that the man in photograph number five was at the scene and had a gun. He stated that he had already identified this person. He circled the photograph and signed and dated it. One of the officers identified this man to Mr. Myles as "Alexander Vance." Mr. Myles stated that he knew who Mr. Vance was but denied being friends. He agreed with the characterization of "acquaintance." Mr. Myles reiterated that he did not know who fired the shots. Before the interview concluded, Mr. Myles crossed out his name as identifying the person depicted in photograph number five.

Mr. Myles also spoke during the May 3 interview of having committed multiple home burglaries.

At trial, Mr. Myles reviewed the recordings of the statements that he had given to law enforcement and that had been played for the jury. Then asked by the State if he had anything to add, Mr. Myles responded:

> Well, really, most of that stuff was like detectives was on my back and it was a lot of stuff that I heard from the streets, so I was trying to get them off of my back, but I still, I don't know most of it, I said some, but most of the stuff I heard.

He stated that he still did not remember everything.

On cross-examination by the Defendant's lawyer, Mr. Myles clarified that the names that he gave to law enforcement were based on information that he heard on the street, not on what he witnessed.

James Gray, one of the Defendant's cousins, testified that he had known the Defendant since they were young. He identified the Defendant at trial. He stated that the Defendant went by the "tag name" of 60 Racks. He also stated that he did not want to testify but was there because he had been subpoenaed.

Mr. Gray stated that, during a family argument, the Defendant told him, "I got one n***** under belt, you can end up like a n***** at T Hill . . . ." Mr. Gray also stated that the Defendant had a tattoo of a cross on his face. Mr. Gray acknowledged that he had a prior felony conviction.

When asked if the Defendant said anything specific about something that had happened at Trinity Hills, Mr. Gray responded, "you know, I ain't really want to get into any of that. I don't, I told, like I told you, man, I don't want to put my life on the line on anything I say, anything about nobody."

Lodorea Page, Damonta's sister, also testified. She stated that Mr. Gray was her "baby daddy." She knew the Defendant because he was her sister's "baby daddy." She recalled hearing the Defendant say that "he had got some studio equipment and that he was trying to sell this studio equipment for his kid's Christmas." She did not recall how the Defendant obtained the equipment. She denied telling Detective Andrew Davis that she heard the Defendant say that he had killed someone for his kid's Christmas presents.

Asked to identify the Defendant in the courtroom, Ms. Page responded, "[H]e ain't in here. I don't see him." She also stated that she did not want to testify and was there only because she had been subpoenaed. Asked why she did not want to testify, she responded, "Because I don't want to put me or my kids life on the line, neither my baby daddy, because it is like a Crip gang that they are in and our car already got shot up and we don't know who did it."

Detective Stanley Truitt testified that he interviewed Mr. Holt, Ms. Harris, and Mr. Myles at the police station on the night of the encounter. He also participated in the interview of Mr. Myles on January 4, 2013. During this interview, Mr. Myles identified Damonta from a photographic array. Mr. Myles also identified Joshua/Neno from another photographic array.

On cross-examination, Detective Truitt explained that another detective had initially talked to the victims at the hospital, and he thought he also talked to them there. He conducted a "formal" interview with them later that night at the police station. He initially thought that Mr. Myles was not being entirely forthcoming about what had happened. He explained that he believed that Mr. Myles and the assailants had belonged to the same gang, although he stated that he was "not sure where [he] got the information from . . . ." He explained that his threats to possibly charge Mr. Myles were, at least in part, a tactic to elicit information. Asked about his current thoughts concerning any possible involvement by Mr. Myles, he answered, "I don't necessarily think he had involvement with it, but I think just like I told him I think he knew though who those guys were that they went to meet."

According to Detective Truitt, Mr. Myles received a phone call on his cell phone during the December 26 interview. He placed the call on speaker and identified the caller as "Ratchet."

Detective Andrew Davis testified that he took over as lead detective in this case after Detective Middleton retired. He confirmed that Ms. Harris, Mr. Holt, and Mr.

9

Myles had all been interviewed about the events both at the hospital and at the station on the night of December 26, 2012. He described the witnesses as "reluctantly cooperative." He added, "I believe they were very scared, reluctant to give information which is common in a lot of these types of crimes."

The initial report of nicknames "Neno," "Monte," and "Alex" led the police to develop Joshua and Damonta as suspects "pretty immediately." They were initially unaware of who "Alex" was or what his last name was. Travaris Cowan was a "possible witness" who had been reported as having walked outside on one of the balconies or one of the breezeways at the time, but they later concluded that he had nothing to do with the crimes.

Detective Davis discovered a Facebook account for "Monte, Ratchet, which belonged to Damonta Meneese."

Detective Davis also testified that the Defendant's phone records were subpoenaed and that those records revealed calls before the shooting between the Defendant's phone and the phones of the victim and Mr. Myles. The records also indicated a call between the Defendant's phone and Mr. Myles immediately after the shooting. Detective Davis acknowledged that the only proof he had that the phone number was the Defendant's came from Mr. Myles.

Detective Davis also testified about his conversations with Mr. Gray and Ms. Page. Mr. Gray told him that the Defendant went by the name "ABK 60." Detective Davis explained that this name meant "Anybody Killer 60" and that the "60" referred to the Nashville gang "Rollin Crip 60." Mr. Gray also told Detective Davis that the Defendant had told Mr. Gray that "what happened to little buddy in Trinity Hills" could happen to Mr. Gray. Detective Davis stated that Ms. Page told him that she heard the Defendant say, "I have got one under my list, I will put another one under my list . . . ." She also heard the Defendant say that "he had killed a guy for his kid's Christmas" and that he was "sorry that he shot a guy for some studio equipment for that reason."

Detective Davis stated that Mr. Myles was never charged in this case. His willingness to testify did not factor into that decision. He affirmed that Mr. Myles had said that the persons involved in these crimes were in a gang, and stated that "there is a level of fear" associated with testifying against gang members.

According to Detective Davis, the police did not determine who called Mr. Myles during the December 26 interview. Mr. Myles told them that "Brian" had set the robbery up, and their investigation led them to conclude that a person named Brian Thompson had "arranged for the subjects to rob the victim of the studio equipment." The victim's phone records indicated that the victim had spoken with Brian Thompson before the robbery. Mr. Myles' phone records indicated that he spoke with Brian both before and

after the robbery. The police also interviewed Latorias Grisham, who "had information about the robbery." They were not able to locate Mr. Grisham in order to bring him to the trial to testify.

During cross-examination, Detective Davis agreed that Mr. Myles was in custody on an aggravated assault charge on May 3, 2014. He also acknowledged that Detective Middleton initially considered Mr. Myles as a possible suspect.[6] Detective Davis stated that he believed Mr. Myles "was in fear of having his name associated with identifying people in this case . . . ." Mr. Myles also was concerned that the police thought he was involved and sought reassurance from Detective Davis that he did not believe that Mr. Myles was involved.

During cross-examination, Damonta's lawyer engaged in the following colloquy with Detective Davis:

> Q. Is it fair to say that Mr. Damonta Meneese he is only a defendant because of being placed at the scene by the three eyewitnesses?
>
> A. No.
>
> Q. What else has you, makes you believe he is involved? There is no DNA evidence, correct, the DNA evidence actually says his DNA was not present; is that correct?
>
> A. That's correct.
>
> Q. And then there was no fingerprint evidence, yet, [Ms. Harris] after some time says he was there; is that correct?
>
> A. That's correct.
>
> Q. And Mr. Holt says he was there?
>
> A. (Nodded up and down.)
>
> Q. And then Mr. Myles, which we talked eventually said he was there?
>
> A. Correct.

---

[6] The jury was charged to determine whether Mr. Myles was an accomplice. The jury was further charged that, if it determined that he was, "then the [D]efendant . . . cannot be convicted upon the uncorroborated testimony of" Mr. Myles.

11

The Defendant's lawyer pursued a similar line of questions, asking Detective Davis, "It would appear from, from what had been testified to that with the exception of Neno everyone else implicated into this were directly or indirectly the product from Prince Myles, correct." Detective Davis answered, "Not, not completely, no." The following colloquy ensued:

Q. Well, I mean, who else is there? I mean, Mr. Holt . . . has admitted to this jury that all of his information that implicated [the Defendant] came from Mr. Myles. Now, Ms. Harris didn't give you the name Alex that night, did she?

A. Not, no, not that I recall.

. . . .

Q. Okay. Now, did you look for anybody else with the name Alex that could have been part of this?

A. No, well, no, when I came on Alexander Vance was the name that I was given that Prince Myles had obtained for Detective Middleton.

Q. Okay. So here again we are relying on Prince Myles information. You didn't go back and double-check? I mean, theoretically, y'all have got all of this stuff on computer now, don't you, people that are booked and convicted and this sort of thing?

A. Right.

Q. . . . . [A]nd so you could have gone in there and said given the height and weight and the name Alex and it would have generated some names, wouldn't it?

A. Correct.

Q. But that wasn't done because you were going on what Detective Middleton had amassed up to that point in time?

A. Yeah. I'm not, I'm not aware of [sic] that was done or not.

Q. Okay. But there is nothing in the record to indicate that it was done—

A. Correct.

12

The cross-examination then continued in a different vein. Detective Davis acknowledged that there was "no love lost" between Mr. Gray, Ms. Page, and the Defendant. He also acknowledged that Ms. Page, the sister of Joshua and Damonta, told him that her brothers were not involved in these crimes. He also acknowledged that Mr. Myles had bragged about having burglarized over one hundred homes. He acknowledged that Mr. Holt, Ms. Harris, and Mr. Myles were not segregated from one another after their interviews on December 26.

After the cross-examination of Detective Davis concluded, the State requested a bench hearing. While the jury was out, the prosecutor asserted that both defense lawyers had implied through their questions to Detective Davis that the only identification of the Defendant and Damonta as perpetrators had come from Mr. Myles.[7] The prosecutor then stated that "the severed out co-defendant, Joshua Meneese, made a statement to Detective Davis that implicated himself and both of these other two defendants in this crime and gave him specific information about the three of them committing this crime and the roles that they played." The prosecutor asserted that defense counsel had opened the door to the admission of Joshua's statement.

Both defense lawyers objected. Counsel for Damonta argued that he had not opened the door through his questions; stated that the inadmissible hearsay sought by the State "is not just inadmissible hearsay, it is inadmissible hearsay because he is not here"; and argued that the severed codefendant's statements were inherently unreliable because his trial had been severed due to questions about his competence. The Defendant's lawyer pointed out that he had filed a motion in limine requesting the exclusion of Joshua's statements, which the trial court had granted. The Defendant's lawyer also argued that, if Joshua "was incompetent on 12-26-12 we are entitled to let the jury hear that and argue about it, even if he said something, according to our experts you can't rely on it, because he is not competent." The Defendant's lawyer also agreed with the arguments that Damonta's lawyer made.

In summary, the arguments made by defense counsel at trial boiled down to four objections to the evidence sought by the prosecutor: (1) the trial court had granted a motion in limine regarding Joshua's statements; (2) the sought-after evidence was inadmissible hearsay; (3) the statements had been made by an incompetent declarant; and (4) they had not opened the door during cross-examination to this otherwise inadmissible evidence. Although counsel for Damonta made a passing reference to the fact that Joshua was "not here," he did not mention the confrontation clause nor his lack of opportunity to have cross-examined Joshua previously. The next statements that

---

[7] During his opening statement, Damonta's lawyer asserted to the jury that Mr. Holt, Mr. Myles, and Ms. Harris "are the only people who have put [Damonta] at the scene . . . ." The Defendant's lawyer asserted during his opening statement that Mr. Myles was "[t]he only person who eventually says" and "[t]he only person that claims" that the Defendant was at the crime scene.

Damonta's lawyer made were "the entire statement [by Joshua] itself is being called into question because of his competence" and "[s]o it is not just a matter of hearsay, we don't even know if this statement is true or even credible because he is incompetent." The Defendant's lawyer, like Damonta's lawyer, did not refer to his client's constitutional rights of confrontation.

The trial court asked the prosecutor if there was a "limited question that [she] could ask [Detective Davis] without getting into a lot of other things about this incompetent defendant who is not on trial . . . ." The prosecutor suggested that she ask Detective Davis whether, "[o]ther than Prince Myles[,] were you able to interview another person with personal knowledge who was at the scene who also implicated these two defendants."

Damonta's lawyer continued to object. He argued that Joshua's statement was not reliable because his competency had not been determined. He also argued that, because Joshua's "statement was given without an attorney," they would "have to litigate the circumstances around that statement, whether it was voluntary . . . ." He added that Joshua was "not just a witness he is a codefendant and the law is clear if a codefendant implicates another codefendant then there has to be other evidence that corroborates with that . . . ." The Defendant's lawyer agreed with these contentions.

Referring to the Court of Criminal Appeals' decision in State v. Land, 34 S.W.3d 516 (Tenn. Crim. App. 2000), the trial court ruled that the State could "ask that one simple question . . . ."

Back in front of the jury, the State conducted its redirect examination of Detective Davis. Asked why he had not considered Mr. Myles a suspect, he responded,

I think one of the first and foremost things he was in the car when the car was shot at making him a possible target of being killed. Another reason is it was learned that it was actually [the victim] Stephen Milliken that initiated this deal of wanting to sell the equipment.

Another factor being that this equipment was in their apartment, Prince Myles and Stephen Milliken, he at any point could have attempted to take this equipment without there having to be any kind of fake robbery or anything like that.

Another issue, I mean, if I were setting a robbery I would think that it would seem that you would want to appear as being a part of that robbery which Prince Myles was not and I, I think also he's, he has been cooperative, um, he's, he gave, he identified these three individuals,

14

descriptions were given early on describing the face, well, he, he was able to pick these three out of a photo line-up.

He provided the name Alexander Vance when he was actually in North Carolina that he had moved to. I think when he had gotten distance and again I think the reason for him being slow walking and giving us these names is he was in fear.

He added that Mr. Myles allowed the police to examine his cell phone and provided information about his contacts. Detective Davis also added that Mr. Myles gave a physical description of the Defendant at the hospital immediately after the crimes, describing the Defendant as a light-skinned male with a tattooed cross under his eye.

The State ended its redirect examination of Detective Davis with the following colloquy:

Q. Okay. And then finally the most important question I will ask you, other than Prince Myles was there a witness with independent and personal knowledge who was at the scene who implicated Damonta Meneese in this case?

A. Yes.

Q. Was there, other than Prince Myles, was there a witness with independent and personal knowledge who was at the scene and implicated Alexander Vance in this case?

A. Yes there was.

The defense did not present any proof. During its rebuttal closing argument, the State referred several times to Detective Davis' testimony about the unidentified eyewitness.[8]

---

[8] Initially, the prosecutor stated,

The, again, uncontroverted testimony of Detective Davis when he sat in that witness stand he said, yes, there was another witness, who was an eyewitness, who was able to independently view what happened and he was able to say that Alexander Vance was involved in the robbery and he was able to say that Damonta Meneese was involved in that robbery. That is uncontroverted and you are to consider that evidence just like you consider every other piece of evidence in this case.

Later, the prosecutor stated, "Everything that you heard on the interview with Prince Myles is something that you can consider and you can also consider everything that Detective Davis said including there is another person who independently corroborates that these two defendants are culpable." Finally, the

After deliberating, the jury convicted the Defendant of the lesser-included offense of second degree murder on the first count of the indictment. The jury convicted the Defendant as charged on the remaining counts. The trial court subsequently merged the second degree murder conviction into the first degree murder conviction and sentenced the Defendant to an effective term of life in prison plus twenty-one years.

The Defendant timely filed a motion for new trial contending, among other things, that the trial court had committed reversible error in allowing Detective Davis to testify about the unidentified eyewitness. The Defendant reiterated the arguments that he had made at trial, including that he had not opened the door to this testimony; that Joshua's competency was at issue; and that the trial court had granted his motion in limine. The Defendant also added, for the first time, that the trial court's ruling had violated his rights under the confrontation clauses of the federal and state constitutions.[9]

After a hearing, the trial court denied the Defendant's motion in a written order. The trial court explained that it had "allowed a limited portion of otherwise inadmissible testimony to be admitted under the doctrine of curative admissibility" because, while cross-examining Detective Davis, both defense lawyers had "asked a number of questions implying that the State's entire case revolved around Mr. Prince Myles' identification of the Defendant and Mr. Damonta Meneese." The trial court explained that it had allowed the State to inquire about the unidentified eyewitness "under the doctrine of curative admissibility because the door had been opened for the admission of evidence which otherwise would have been excluded." The trial court continued:

> The doctrine of curative admissibility allows the State, on re-direct examination, to ask questions of the witness so as "to clarify or explain the matters brought out during, or to remove or correct unfavorable inferences left by, the previous cross-examination." State v. Land, 34 S.W.3d 516,

---

prosecutor said, "We also heard Detective Davis say that the other people who were on the scene corroborate exactly how this went down" and "most importantly the witness that Detective Davis testified about, he said that he was able to, it was somebody who was there and who saw what happened and was able to verify that these two defendants are the perpetrators in this case."

[9] As interpreted by the Supreme Court in Crawford v. Washington, 541 U.S. 36, 53-55 (2004), the federal confrontation clause bars the admission of out-of-court testimonial statements made by a declarant unless the declarant is (1) available at trial for cross-examination or (2) unavailable and the defendant had a prior opportunity to cross-examine the declarant. Statements made during a police interrogation are testimonial. Id. at 53. We apply the same analysis to claims under the confrontation clause contained in the Tennessee Constitution. State v. Dotson, 450 S.W.3d 1, 62 (Tenn. 2014) (footnote omitted) (citing State v. Parker, 350 S.W.3d 883, 898 (Tenn. 2011); State v. Franklin, 308 S.W.3d 799, 809-10 (Tenn. 2010); State v. Cannon, 254 S.W.3d 287, 301 (Tenn. 2008); State v. Lewis, 235 S.W.3d 136, 145 (Tenn. 2007)). The State does not contend that Joshua's pretrial statement was not testimonial nor does it contend that the defense had a prior opportunity to cross-examine him. Accordingly, the Defendant argues that his constitutional rights to confront Joshua about his statement were violated.

16

531 (Tenn. Crim. App. 2000). The Court is of the opinion that the facts of this case are very similar to the facts of Land. See id. at 532. In Land, during direct examination of one of the detectives who had worked the case, the State sought to introduce statements a third-party made through the detective that were probative of the defendant's intent to commit the offense. The defense attorney objected to this as inadmissible hearsay evidence, and the trial court sustained the objection. See id. at 530. However, on cross-examination of the same detective, the defense attorney asked repeated questions about where the State's proof of the defendant's intent was. See id. Based on the implications created during cross-examination, the trial court allowed the State to introduce the otherwise inadmissible hearsay evidence under the doctrine of curative admissibility, because otherwise the defendant would have benefited from the negative inference that the State did not have proof of intent. See id.

Here, while the Court is not of the opinion that either Mr. Collins or Mr. Boykin were willfully trying to subordinate the fairness of the trial in their questioning, the Court still finds that both of their lines of questioning created a strong negative inference that the only eyewitness who had independently identified the Defendant and Mr. Damonta Meneese as the perpetrators was Mr. Prince Myles. While the Court recognizes that there is a fine line that must be walked in situations like this one where the Defendant must be able to attempt to cast doubt on the State's case, the Court is of the opinion that the questioning in this case clearly crossed over that line. Accordingly, the Court was and remains of the opinion that to not have allowed the State to rebut the negative inference created by cross-examination would have eviscerated the "fundamental guarantee of fairness" that exists in such proceedings. See id. at 531.

The Defendant also contends that the Confrontation Clause barred the State from asking the questions that it did of Detective Davis. The Court disagrees. Although the issue has not been squarely addressed by Tennessee appellate courts, in considering the intersection of questions of the Confrontation Clause and curative admissibility, other courts have held that when "the prejudice is obvious and substantial," the implication of a defendant's Confrontation Clause rights does not prohibit the application of the doctrine of curative admissibility. Id. at 532, n. 12 (quoting United States v. Winston, 447 F.2d 1236, 1240-41 (D.C. Cir. 1971)). The Court is persuaded by the reasoning underlying this rule and is of the opinion that it is applicable in the instant case as well. To rule otherwise would allow defendants to hide behind the Confrontation Clause to introduce otherwise inadmissible evidence or to create inferences that are favorable to the defense, knowing that even if the doctrine of curative admissibility

17

otherwise applied, the State could not introduce certain evidence in rebuttal. While the Court is not of the opinion that Mr. Collins or Mr. Boykin were acting in bad faith in their questioning, they were certainly both attempting to paint a more favorable picture of the facts for their clients by focusing on the fact that Mr. Prince Myles was the only eyewitness about whom Detective Davis had testified to that point who had independently identified the Defendant and Mr. Damonta Meneese. In light of this, the Court is of the opinion that the State was permitted to rebut the negative inference created by asking its limited questions, even in spite of the Defendant's Confrontation Clause rights. Accordingly, in light of the foregoing, the Court is of the opinion that the Defendant is not entitled to a new trial on the ground of the admission of the State's limited questions of Detective Davis and his response.

The Defendant subsequently perfected his direct appeal to the Court of Criminal Appeals, which affirmed the trial court's judgments. State v. Vance, No. M2017-01037-CCA-R3-CD, 2018 WL 5840686, at *8 (Tenn. Crim. App. Nov. 7, 2018), perm. app. granted (Tenn. Feb. 20, 2019). Applying plenary review, the Court of Criminal Appeals held that the trial court had not abused its discretion "in ruling that the Defendants had opened the door to the use of Neno's ["Joshua"] statement to prevent the impression only a single witness identified the two Defendants as participants in the crime." Id. at *6. The Court of Criminal Appeals specifically rejected the Defendant's confrontation clause argument, relying on this Court's decision in State v. Robinson, 146 S.W.3d 469, 493 (Tenn. 2004), and its own decision in State v. Price, No. E2011-01050-CCA-R3-CD, 2013 WL 5371679, at *14 (Tenn. Crim. App. Sept. 26, 2013), perm. app. denied (Tenn. Mar. 11, 2014). Id. at *5-6.

The Defendant then sought this Court's permission to appeal, setting forth the following as his questions presented:

1. Whether under the doctrine of [curative] admissibility, a testimonial hearsay statement can be admitted at trial given the U.S. Supreme Court decision of Crawford v. Washington, 541 U.S. [3]6 (200[4]).

2. Whether the [t]rial [c]ourt erred in admitting the inculpatory statements relative to the [Defendant] by a non-testifying co-defendant, in violation of the U.S. Supreme Court's ruling in Bruton v. United States, 391 U.S. 123 (1968) under the doctrine of curative admissibility.

3. Whether it was error for the [t]rial [c]ourt to admit the inculpatory statements against his co-defendants in a trial from which he had been severed due to questions of sanity.

4. Whether it was error to admit the inculpatory statements made to the police by a severed co-defendant against his co-defendants in the case where [the Defendant] had filed a Motion in Limine stating that if the State intended to use any of the statements against the [Defendant] in the trial that the [Defendant] was not prepared to go to trial until the question of this severed co-defendant's sanity had been determined and said motion had been granted.

We granted the Defendant's application and asked the parties to consider two additional issues:

1. Whether plenary or plain error review applies to the constitutional ground, when [the Defendant] included it in his motion for new trial but contemporaneously objected on other grounds.

2. Whether the admissibility of the evidence is controlled by the doctrine of curative admissibility. See State v. Gomez, 367 S.W.3d 237, 248 (Tenn. 2012) ("On appeal to this Court, the State 'concedes that the admissibility of this evidence is not controlled by the doctrine of curative admissibility' because Ms. Lopez's response to the question from Mr. Gomez's counsel was not inadmissible.").

Order, State v. Vance, No. M2017-01037-CCA-R3-CD (Tenn. Feb. 20, 2019) (granting Tennessee Rule of Appellate Procedure Rule 11 application).

## Analysis

The issues before us arise from the trial court's decision to allow the State to elicit testimony from Detective Davis about an unidentified eyewitness who had implicated the Defendant in these crimes. The trial court based its ruling on the doctrines of "curative admissibility" and "opening the door."

We begin by noting that, although the doctrines of "curative admissibility" and "opening the door" are distinct, courts frequently, but incorrectly, refer to them as if they are synonymous. See, e.g., State v. James, 677 A.2d 734, 742 (N.J. 1996) (noting that, irrespective of the "subtle differences" between the doctrines, courts use them "interchangeably"); see also, e.g., Bentley v. State, 711 P.2d 544, 546 (Alaska Ct. App. 1985) ("'Opening the door' to otherwise inadmissible evidence is often referred to as the doctrine of 'curative admissibility.'" (citing 1 John H. Wigmore, Evidence § 15 (Tillers rev. 1983))); Land, 34 S.W.3d at 530-31 (citing People v. Manning, 695 N.E.2d 423, 433 (Ill. 1998)) (referring to the doctrine of curative admissibility as being "employed in criminal cases where the 'door' to a particular subject is opened by defense counsel on cross-examination"); Wright v. Commonwealth, 473 S.E.2d 707, 709 (Va. Ct. App.

19

1996) ("'Opening the door' to the admission of evidence is a catchphrase often used to refer to the doctrine of 'curative admissibility.'"); State v. Groce, 111 A.3d 1273, 1277 (Vt. 2014) (stating that the "open-door doctrine" is "also known as the doctrine of invited error or curative admissibility"); Michael H. Graham, 2 Handbook of Federal Evidence § 103:4 (8th ed. Nov. 2019 Update), *available at* Westlaw FEDEVID (referring to opening the door and curative admissibility as the same principle). This Court has recognized that, although the doctrines may be "related," Gomez, 367 S.W.3d at 248, they are not the same and should be analyzed and applied accordingly, id. at 246-48. We take this opportunity to explore in some detail these distinct concepts, beginning with curative admissibility.

Curative Admissibility

As we explained in State v. Gomez, "[c]urative admissibility permits the admission of inadmissible evidence by a party in response to the opposing party admitting *inadmissible* evidence." 367 S.W.3d at 248 (emphasis added) (citing 21 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure Evidence § 5039.3 (2d ed. 1987)). The threshold requirement for application of the doctrine, then, is the elicitation of inadmissible evidence. Only after one party has elicited inadmissible evidence before the fact-finder may the opposing party rely on the doctrine of curative admissibility[10] in order to adduce its own otherwise inadmissible proof.

In addition to its decision in Land, our Court of Criminal Appeals has frequently confused curative admissibility with opening the door, even after our decision in Gomez. See, e.g., State v. Sorrell, No. E2018-00831-CCA-R3-CD, 2019 WL 3974098, at *14-15 (Tenn. Crim. App. Aug. 22, 2019) (equating the doctrine of curative admissibility with opening the door); State v. Clark, No. M2017-02525-CCA-R3-CD, 2019 WL 410705, at *10 (Tenn. Crim. App. Jan. 31, 2019) (same); State v. Myrick, No. E2017-00588-CCA-R3-CD, 2018 WL 3430337, at *28 (Tenn. Crim. App. July 16, 2018) (discussing the concepts of opening the door and curative admissibility as interchangeable). We take this opportunity, then, to provide some guidance about the parameters of curative admissibility.

First and foremost, the doctrine serves the fundamental goal of fairness. As explained by Professor Wigmore:

---

[10] The party eliciting the inadmissible evidence cannot rely on the doctrine of curative admissibility to cure its own mistake. Only proof offered by an opponent triggers the doctrine. 21 Charles Alan Wright, Arthur R. Miller, & Kenneth W. Graham, Jr., Federal Practice & Procedure Evidence § 5039.3 (2d ed. Aug. 2019 Update) [hereinafter 21 Fed. Prac. & Proc. Evid.], *available at* Westlaw FPP (citing Roth v. Homestake Mining Co., 72 F.3d 83, 84 (8th Cir. 1995), as revised by, Roth v. Homestake Mining Co., 74 F.3d 843, 845 (8th Cir. 1996); State v. Craine, 349 P.3d 628, 634 (Or. Ct. App. 2015)).

"[w]here an inadmissible fact has been offered by one party, and the opponent afterwards, for the purpose of negativing or explaining or otherwise counteracting it, offers a fact similarly inadmissible . . . the second fact is admissible if it serves to remove an unfair effect upon the jury which might otherwise ensue from the original fact."

21 Fed. Prac. & Proc. Evid. § 5039.3 (footnote omitted) ; see also, e.g., In re Air Disaster at Lockerbie Scot. on Dec. 21, 1988, 37 F.3d 804, 817 (2d Cir. 1994) (recognizing that "[a] trial court may in the interests of fairness allow otherwise inadmissible evidence on an issue when necessary to rebut a false impression left by inadmissible evidence introduced by an opposing party" (citing United States v. Rea, 958 F.2d 1206, 1225 (2d Cir. 1992)), abrogated on other grounds by Zicherman v. Korean Air Lines Co., 516 U.S. 217 (1996).

Curative admissibility, therefore, is not a "tit for tat" doctrine. The first line of defense against inadmissible evidence is a contemporaneous objection, perhaps coupled with a curative instruction. See In re Lockerbie, 37 F.3d at 817 (holding that opposing party did not have right to introduce inadmissible evidence after trial court determined that a strike and curative instruction were sufficient to cure impact of inadmissible evidence); 21 Fed. Prac. & Proc. Evid. § 5039.3 n.38 ("If no objection is made, the evidence is admissible and curative admissibility cannot be invoked.").

Moreover, only if the party opposing the inadmissible evidence suffers some particular and significant prejudice from its being heard by the fact-finder does the doctrine have possible applicability. See, e.g., United States v. Nardi, 633 F.2d 972, 977 (1st Cir. 1980) (doctrine of curative admissibility was not applicable where the inadmissible evidence was not prejudicial); Kessler v. Wal-Mart Stores, Inc., 587 N.W.2d 804, 808 (Iowa Ct. App. 1998) ("The theory of curative admissibility is not applicable where the plaintiff has shown neither that inadmissible testimony was offered or that prejudice resulted." (citing Lala v. Peoples Bank & Trust Co., 420 N.W.2d 804, 807-08 (Iowa 1988))).

In keeping with the overall concern for fairness, if the doctrine is deemed applicable, the inadmissible evidence offered as the "cure" must be both relevant and proportional. As colorfully described in Federal Practice and Procedure Evidence, "tossing a stink bomb into the jury box does not justify nuking the offender in retaliation." 21 Fed. Prac. & Proc. Evid. § 5039.3 (citations omitted); see also, e.g., United States v. Rucker, 188 Fed. App'x 772, 779 (10th Cir. 2006) (recognizing that curative admissibility "is limited to the prevention of prejudice and used only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original [inadmissible] evidence" (quoting United States v. Morales-Quinones, 812 F.2d 604, 609-10 (10th Cir. 1987))) (alteration added); Valadez v. Watkins Motor Lines, Inc., 758 F.3d 975, 981-82 (8th Cir. 2014) (recognizing that "[t]he remedy for improper

evidence is not always additional improper evidence[,]" rather, "[t]he rebuttal evidence offered to cure the error must be commensurate with the magnitude of the error itself"); Nardi, 633 F.2d at 977 ("The doctrine [of curative admissibility] applies . . . only when inadmissible evidence has been allowed, when that evidence was prejudicial, and when the proffered testimony would counter that prejudice.").

This Court has not yet expressly adopted the doctrine of curative admissibility. While we briefly discussed it in Gomez, we did not reach the issue of its possible applicability because the threshold predicate of the first party eliciting inadmissible testimony had not been met.

Similarly, in this case, the State sought the admission of inadmissible proof in response to cross-examination by the defense lawyers that did *not* elicit inadmissible testimony. None of Detective Davis' responses to the relevant cross-examination included inadmissible evidence. Accordingly, the doctrine of curative admissibility was not applicable, and the trial court was mistaken in describing the rationale for its ruling as resting, at least in part, on the doctrine of curative admissibility.

We turn now to the other justification relied on by the trial court for its ruling: "opening the door."

Opening the Door

As we explained in Gomez,

> Even if evidence is inadmissible, a party may "open the door" to admission of that evidence. A party opens the door to evidence when that party "introduces evidence or takes some action that makes admissible evidence that would have previously been inadmissible." 21 Charles Alan Wright et al., Federal Practice & Procedure Evidence § 5039 (2d ed. 1987).

> The most common manner by which a party opens the door to inadmissible evidence is by raising the subject of that evidence at trial. When a party raises a subject at trial, the party "expand[s] the realm of relevance," and the opposing party may be permitted to present evidence on that subject. 21 Charles Alan Wright et al., Federal Practice & Procedure Evidence § 5039.1; see also Clark v. State, 332 Md. 77, 629 A.2d 1239, 1242 (1993) ("The 'opening the door' doctrine is really a rule of expanded relevancy . . . .").

> Although raising a subject at trial is one manner of opening the door to otherwise inadmissible evidence, the concept of "opening the door" is "notoriously imprecise." 21 Charles Alan Wright et al., Federal Practice &

22

Procedure Evidence § 5039. Although the doctrine arises from the common law tradition of evidence, . . . our Rules of Evidence contain numerous examples by which otherwise inadmissible evidence may become admissible as a result of the action of a party in the case. For example, if evidence of prior bad acts of a defendant is inadmissible, the defendant may open the door to admission of that evidence by putting his character at issue. Tenn. R. Evid. 404(a)(1), (2); see also Tenn. R. Evid. 405(a). A party may also "open the door" to evidence of a witness's truthful character by attacking the reputation of a witness for truthfulness. Tenn. R. Evid. 608(a). In short, "opening the door" is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence.

367 S.W.3d at 246. Or, as stated rather more pithily by Tennessee Law of Evidence,

On occasion, a party wants to have its evidence cake and eat it too. This party may "open the door" to the admission of otherwise inadmissible evidence, then object when that evidence is rendered. Tennessee law has long recognized that a party "will not be permitted to take advantage of errors which he himself committed, or invited, or induced the trial court to commit, or which were the natural consequences of his own neglect or misconduct."

Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, Tennessee Law of Evidence § 1.03[3][d] (6th ed. 2011) (quoting Norris v. Richards, 246 S.W.2d 81, 85 (Tenn. 1985)).

We emphasize that a party may open the door to otherwise inadmissible evidence by eliciting *admissible* evidence, in contrast to the doctrine of curative admissibility. 21 Fed. Prac. & Proc. Evid. § 5039.1 ("Unlike 'curative admissibility,' true 'opening the door' does not require the prior admission of inadmissible evidence." (citations omitted)). Unlike the doctrine of curative admissibility, which requires the opposing party to object to the inadmissible evidence before requesting a cure, a party opening the door will not necessarily elicit an objection from the opposing party. Indeed, in this case, because the defense did not elicit inadmissible testimony from Detective Davis during its cross-examination, the State was not required to (and did not) object before seeking a remedy.

Like curative admissibility, opening the door is a doctrine intended to serve fairness and truth-seeking. See, e.g., Ramirez v. State, 739 So.2d 568, 579 (Fla. 1999) ("The concept of 'opening the door' is 'based on considerations of fairness and the truth-seeking function of a trial.'" (quoting Bozeman v. State, 698 So.2d 629, 631 (Fla. Dist. Ct. App. 1997))). Accordingly, as with curative admissibility, the remedy sought after a party has opened the door should be both relevant and proportional. The otherwise inadmissible evidence sought to be introduced by the opposing party should be limited to

that necessary to correct a misleading advantage created by the evidence that opened the door.  See, e.g., State v. Gaudet, 97 A.3d 640, 646 (N.H. 2014) (recognizing that the opening the door doctrine applies "to situations in which one party has introduced admissible evidence that creates a misleading advantage and the opponent is then permitted to introduce previously suppressed or otherwise inadmissible evidence to counter the misleading advantage") (citing State v. Wamala, 972 A.2d 1071, 1076 (N.H. 2009)).  More specifically,

> For this doctrine to apply, a party must introduce evidence that provides a justification, beyond mere relevance, for the opponent's introduction of evidence that may not otherwise be admissible.  However, the initial evidence must have reasonably misled the fact finder in some way.  The rule, thus, prevents a party from successfully excluding evidence favorable to his opponent and then selectively introducing some of this evidence for his own advantage, without allowing the opponent to place the evidence in proper context.  The fact that the "door has been opened" does not permit all evidence to pass through because the doctrine is intended to prevent prejudice and is not to be subverted into a rule for the injection of prejudice.  The trial court is in the best position to gauge the prejudicial impact of particular testimony.

Id. (citing and quoting Wamala, 972 A.2d at 1076-77 (citations and internal quotation marks omitted)).  As similarly recognized by the Connecticut Court of Appeals,

> The doctrine of opening the door cannot . . . be subverted into a rule for injection of prejudice. . . . The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence. . . .  [I]n making its determination, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal.

State v. Phillips, 927 A.2d 931, 943 (Conn. Ct. App. 2007) (quoting State v. Graham, 509 A.2d 493, 496 (Conn. 1986)); see also James, 677 A.2d at 742 (recognizing that "[t]he 'opening the door' rule has its limitations.  For example, evidence is still subject to exclusion where a court finds that the probative value of the otherwise inadmissible responsive evidence 'is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury . . . .'" (quoting N.J. R. Evid. 403)).

<u>Application</u>

In this case, the Defendant's primary defense was that the State's proof of his identity as one of the perpetrators was not credible. Mr. Myles was the only eyewitness at trial who had positively identified the Defendant as one of the three perpetrators, although Mr. Myles declined to identify the Defendant as such during his testimony. The defense theory was to impeach Mr. Myles' credibility and argue that the remaining evidence was either not credible or not enough upon which to conclude that the Defendant was one of the perpetrators. The defense tried to imply to the jury during its cross-examination of Detective Davis that the police investigation was inadequate and that the charges against the Defendant were based on nothing more than Mr. Myles' questionable statements.

In our view, the cross-examination of Detective Davis by the Defendant's lawyer clearly implied that there was no other eyewitness to the crimes who had identified the Defendant as one of the perpetrators. The Defendant's lawyer knew that this implication was misleading because he knew that Joshua had stated that both he and the Defendant had been involved. The Defendant's lawyer was trying to take advantage of the pretrial ruling that Joshua's statements were inadmissible in order to create a misleading impression about the strength of the State's investigation and proof. This is precisely the type of conduct for which the doctrine of "opening the door" was created.

In short, we hold that the defense opened the door for the State's introduction of proof sufficient to correct the misleading impression created by the cross-examination of Detective Davis. Nevertheless, the issue before us is whether the cross-examination of Detective Davis opened the door to the admission of Detective Davis' testimony that an unidentified eyewitness had been at the scene and had implicated the Defendant as one of the perpetrators. We hold that the trial court should not have allowed the State to adduce this testimony on redirect because its prejudicial impact substantially outweighed the misleading impression created by the defense's cross-examination.[11]

In <u>State v. Galmore</u>, this Court considered the prejudicial impact of impeaching a criminal defendant through proof of an unidentified prior felony conviction. 994 S.W.2d 120, 122 (Tenn. 1999). We held that the trial court erred in ruling that the State could impeach the defendant's credibility in this manner because "[n]ot identifying the felony . . . would permit a jury to speculate as to the nature of the prior conviction[,]" <u>id.</u> (citing <u>State v. Barnard</u>, 899 S.W.2d 617, 622 (Tenn. Crim. App. 1994)), and because "instructing the jury on an unnamed felony would provide inadequate information for a jury to properly weigh the conviction's probative value as impeaching evidence," <u>id.</u> (citing <u>State v. Summerall</u>, 926 S.W.2d 272, 277 (Tenn. Crim. App. 1995)).

---

[11] Given our holding, we need not address the State's argument that the Defendant's cross-examination of Detective Davis constituted a waiver of his confrontation clause rights. <u>See</u> <u>Robinson</u>, 146 S.W.3d at 493.

25

In the instant case, Detective Davis' testimony that an unidentified eyewitness had implicated the Defendant similarly called for the jury to speculate about who the eyewitness was and, more significantly, offered the jury absolutely no indication about the reliability of this person's statement or the proper weight to accord it. Under the circumstances of this case, the misleading impression created by the defense simply was not so damaging as to justify the revelation of this "surprise" eyewitness upon whom the State so heavily relied during closing argument and for whom the jury was given no yardstick by which to measure his or her credibility.

Our conclusion that the State's questions to Detective Davis on redirect should not have been allowed, however, does not necessarily entitle the Defendant to relief. Rather, we first must determine what standard of review applies to the Defendant's claim that the trial court's ruling violated his constitutional rights of confrontation.

Level of Appellate Review

We turn now to the first issue we identified in our order granting the Defendant's application for permission to appeal: whether plenary or plain error review applies to the Defendant's claim that the trial court's ruling violated his constitutional rights to confront his accusers when he included this ground in his motion for new trial but contemporaneously objected on other grounds.

We begin with Tennessee Rule of Evidence 103(a):

Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and (1) . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context[.]

Another provision of Rule 103 states that "[n]othing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court." Tenn. R. Evid. 103(d). The clear implication of Rule 103(d) is that evidentiary objections not brought to the trial court's attention at the appropriate time will not be considered under plenary review.

As set forth above, the defense objected at trial to the State's proposed re-direct of Detective Davis. The stated objections did not include the Defendant's rights of confrontation. As this Court recently reiterated, "[a]ppellate review generally is limited to issues that a party properly preserves for review by raising the issues in the trial court and on appeal." State v. Minor, 546 S.W.3d 59, 65 (Tenn. 2018) (citing Tenn. R. Crim. P. 51; Tenn. R. Evid. 103(a)-(b); Tenn. R. App. P. 3(e), 13(b), 27(a)(4), 36(a); State v.

26

Bledsoe, 226 S.W.3d 349, 353-54 (Tenn. 2007)). This obligation to preserve issues applies to constitutional issues as well as non-constitutional ones. Id. (citing United States v. Olano, 507 U.S. 725, 731 (1993)). These preservation requirements "ensure that the defense and the prosecution are afforded an opportunity to develop fully their opposing positions on an issue, and such requirements also enable a trial court to avoid or rectify an error before a judgment becomes final." Id. (citing Puckett v. United States, 556 U.S. 129, 134 (2009); State v. Bishop, 431 S.W.3d 22, 43 (Tenn. 2014); State v. Jordan, 325 S.W.3d 1, 57-58 (Tenn. 2010)). We emphasize that these requirements "serve to promote fairness, justice, and judicial economy by fostering the expeditious avoidance or correction of errors before their full impact is realized, and in this way, may obviate altogether the need for appellate review." Id. (citing Jordan, 325 S.W.3d at 57-58).

In keeping with these principles, a party is bound by the ground asserted when making an objection to the admission of evidence and cannot assert a new or different theory to support the objection in the motion for new trial. State v. Adkisson, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994). This rule applies when a party objects at trial based on a non-constitutional ground and then asserts a constitutional ground for the objection post-trial. Id.

A trial court cannot evaluate an objection that is not made. Moreover, even if a trial court correctly assesses the propriety of an objection that could be raised but is not, trial courts should not assume that the lawyer has simply failed to recognize it. Rather, the lawyer's silence may be deliberate and tactical. Accordingly, we will not fault a trial court for failing to rule on an unexpressed objection even if, in hindsight, the objection appears appropriate.

In his brief to this Court, the Defendant posits two arguments supporting plenary review of his constitutional issues. First, he points to the text of Tennessee Rule of Appellate Procedure 3(e) which provides that, "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." The Defendant argues that, since this provision does not require a timely objection at trial, plenary review is available so long as the objection is raised in the motion for new trial.

We disagree. The Defendant has cited to no cases construing Rule 3(e) in this manner and we decline to do so now. The policy reasons supporting a contemporaneous objection would not be furthered by such a construction. The Defendant is not entitled to plenary review of his constitutional issues on this basis.

The Defendant also argues that we should overlook his failure to raise his constitutional issues at trial because raising them would have been pointless. In support

of this argument, he points to the trial court's denial of his motion for new trial, in which he did raise these issues. Again, we are unpersuaded. A trial court's ruling at the conclusion of a trial cannot be deemed the equivalent of a ruling mid-trial. Trials are fluid processes and contain many moving parts. A trial court's analysis of a legal and/or factual point at one moment during a trial is likely to be affected by ensuing events in the trial, even if unconsciously. Accordingly, the trial court's denial of relief on the Defendant's motion for new trial does not serve to alleviate the consequences of the Defendant's failure to timely object at trial. The Defendant is not entitled to plenary review of his constitutional issues on this basis.

In sum, the Defendant is entitled to relief on his constitutional issues only if he meets his burden of satisfying the criteria for plain error relief.

Unlike plenary review, which applies to all claims of error that are properly preserved, plain error review is limited to those errors which satisfy five criteria: "(1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the issue was not waived for tactical reasons; and (5) consideration of the error is necessary to do substantial justice." Minor, 546 S.W.3d at 67 (citing Tenn. R. App. P. 36(b); State v. Martin, 505 S.W.3d 492, 504 (Tenn. 2016); State v. Hester, 324 S.W.3d 1, 56 (Tenn. 2010); State v. Gomez, 239 S.W.3d 733, 737 (Tenn. 2007)). Moreover, the error must have been of "sufficient magnitude that it probably changed the outcome of the trial." State v. Banks, 271 S.W.3d 90, 119 (Tenn. 2008) (citing Bledsoe, 226 S.W.3d at 354-55).

It is the Defendant's burden to persuade the appellate court that all five criteria are met. State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010). "If a defendant fails to establish any of these criteria, an appellate court must deny relief under the plain error doctrine, and an appellate court need not consider all criteria when the record demonstrates that one of them cannot be established." Minor, 546 S.W.3d at 67 (citing State v. Knowles, 470 S.W.3d 416, 423 (Tenn. 2015)).

Plain Error Review

Having concluded that plain error review applies to the Defendant's claims of constitutional error, we turn to an analysis under that standard of review. We hold that the Defendant is not entitled to plain error relief because the Defendant has not established that substantial justice requires relief. The Defendant also has failed to establish that, absent the alleged error, the outcome of his trial probably would have been different.

In this case, one of the State's key witnesses was Prince Myles. Mr. Myles' testimony at trial was not particularly persuasive. Indeed, he attempted to renege on his previous identifications of the Defendant. However, Mr. Myles' recorded statements to

28

the police, together with other evidence not objected to, provided more than enough proof for the jury to conclude that the Defendant was one of the perpetrators.

In his December 26 statement, Mr. Myles gave a physical description of the Defendant, including a description of a specific tattoo on the Defendant's face. Mr. Myles repeated his physical description of the Defendant during his January 4 statement, including the description of the tattoo. Obviously, the jury was able to assess the accuracy of these descriptions by comparing them against the Defendant's actual appearance at trial.

During his May 4 statement, the police showed Mr. Myles a photographic array. From this array, he identified the Defendant. Mr. Myles also stated that he had previously identified the Defendant. Detective Davis corroborated this statement when he testified that Mr. Myles had identified the Defendant *by name* while Mr. Myles was in North Carolina. Detective Davis testified that he believed Mr. Myles waited to provide the Defendant's name until he was in North Carolina because the distance lessened Mr. Myles' fear of reprisal. Detective Davis explained that, according to Mr. Myles, "pretty much everybody involved in this case is in a gang," and he believed that Mr. Myles' reluctance to identify the Defendant resulted from fear.

While Mr. Myles was the only testifying eyewitness who had twice identified the Defendant as one of the perpetrators—once by name and once by photograph—there was significant additional incriminating evidence. Ms. Harris told one of the officers who interviewed her that a person in one of the photographic arrays looked like the third assailant and that she knew the person's name was "Alex because Prince Myles called his name." Mr. Holt also testified that he heard Neno say the name "Alex" during the encounter. Ms. Page testified that, after the victim's murder, she heard the Defendant say that "he had got some studio equipment and that he was trying to sell this studio equipment for his kid's Christmas." Although she claimed that she did not see the Defendant in the courtroom, she also explained that she was afraid to testify because she did not "want to put [her] or [her kids'] liv[es] on the line."

Detective Davis added that Ms. Page told him that she had heard the Defendant say, "I have got one under my list, I will put another one under my list." According to Detective Davis, she also told him that she had heard the Defendant say that he was "sorry that he shot a guy for some studio equipment."

Mr. Gray testified and also described the Defendant as having a tattoo of a cross on his face. He stated the Defendant had told him, "I got one n***** under belt, you can end up like a n***** at T Hill." Mr. Gray also expressed fear of reprisal for implicating the Defendant.

Detective Davis also testified about his conversation with Mr. Gray. He stated that Mr. Gray had told him that the Defendant threatened him that what "happened to little buddy in Trinity Hills" could also happen to him. Mr. Gray also told Detective Davis that the Defendant went by the nickname "ABK 60." Detective Davis explained that this name meant "Anybody Killer 60" and referred to the gang "Rollin Crip 60."

We are convinced that the jury probably would have convicted the Defendant as it did solely on the basis of this proof, even had it not heard the testimony about the unidentified eyewitness. First, although the defense launched a vigorous attack on Mr. Myles' credibility, our close review of the proof convinces us that a reasonable juror would have attributed his reluctance to identify the Defendant to fear rather than to mendacity. Second, we disagree with the Defendant's assertion that the jurors necessarily concluded that the unidentified eyewitness was Joshua. Detective Davis testified about two other men that had knowledge about the encounter, neither of whom was called to testify. Moreover, even if the jurors assumed that the witness was Joshua, they may also have assumed that Joshua, whom the jury knew was *not* on trial, had thrown the Defendant "under the bus" in exchange for favorable treatment, regardless of any actual involvement by the Defendant. See Ramirez, 739 So.2d at 579 (recognizing that "[a] codefendant's statements are especially suspect because he has a strong motivation to implicate another, rendering these statements even less credible than ordinary hearsay" (citing Lee v. Illinois, 476 U.S. 530, 541 (1986); Farina v. State, 679 So.2d 1151, 1155 (Fla. 1996))). Third, the Defendant's theory that he was prejudiced by Detective Davis' testimony about the unidentified eyewitness depends on an assumption that the jurors gave significant weight to this testimony. That assumption, however, is not supported by the record. The jurors may have assumed that the State did not call the witness because the witness was not credible. Moreover, we presume that jurors apply their common sense to the evidence before them. See, e.g., Schulz v. Penn. R.R. Co., 350 U.S. 523, 526 (1956) (recognizing that "[j]urors are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn"); 7 T.P.I.—Crim. 42.04(a) (23d ed. 2019) (instructing the jury that, "[i]n deciding which testimony you believe, you should rely on your own common sense and everyday experience"); see also State v. McConnell, No. E1998-00288-CCA-R3-CD, 2000 WL 688588, at *9 (Tenn. Crim. App. 2000) (recognizing that it was "a matter of common sense for the jury to know that the appellant was either incarcerated or on bond pending his trial" (citations omitted)), perm. app. denied (Tenn. Jan. 8, 2001); State v. Harrison, 618 A.2d 1381, 1386 (Conn. App. Ct. 1993) (stating that "[w]e presume that the jury uses common sense in its deliberations" (citing State v. Mazzetta, 574 A.2d 806 (Conn. App. Ct. 1990))). Common sense does not attribute significant weight to statements by unidentified persons.[12]

---

[12] Our analysis of how the jurors may have interpreted Detective Davis' testimony about the unidentified eyewitness highlights the concern we expressed earlier in this decision about providing the jury with evidence which requires speculation in order to assess it.

30

Finally, a conclusion that substantial justice requires relief would imply a significant probability that the jury would have acquitted the Defendant had the disputed testimony not been admitted. In light of our close and careful review of the entire record, we are convinced that no such significant probability exists. Accordingly, we hold that the Defendant is not entitled to plain error relief on his claim that the trial court violated his constitutional rights of confrontation by permitting the State to adduce evidence about the unidentified eyewitness.

In light of our holding, the first two issues stated in the Defendant's application for permission to appeal are pretermitted.

Plenary Review

The Defendant preserved for plenary review two issues regarding the trial court's ruling: (1) whether the trial court erred by admitting testimony about a statement made by a person whose competence was at issue, and (2) whether the trial court erred by admitting testimony about a statement that the trial court had earlier ruled was inadmissible.

We already have concluded that the trial court should not have allowed Detective Davis to testify on redirect about the unidentified eyewitness statement implicating the Defendant. We also have concluded, however, that substantial justice does not require the granting of plain error relief. For the same reasons, we hold that, under plenary review, the trial court's error was harmless and does not entitle the Defendant to relief. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

**Conclusion**

For the reasons stated above, we affirm the judgment of the Court of Criminal Appeals. It appearing that the Defendant is indigent, costs are taxed to the State of Tennessee.

_____
JEFFREY S. BIVINS, CHIEF JUSTICE

31